IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALIBU LIGHTING CORPORATION, et al.,[1] | ) Case No. 15-12080 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |

## DECLARATION OF DAVID M. BAKER IN SUPPORT OF FIRST DAY MOTIONS

I, David M. Baker, hereby declare that the following is true and correct to the best of my knowledge, information, and belief. I currently serve as the Chief Restructuring Officer of each of the above-captioned debtors (the "Debtors"). I submit this declaration (the "Declaration") in support of the petitions and "first day" motions and applications filed by the Debtors, which are described further below (collectively, the "First Day Motions").[2]

1.    Except as otherwise indicated, I have personal knowledge of the information contained herein, either directly or through employees of the Debtors, or the Debtors' other advisors, and am competent to testify as to the matters set forth herein. Specifically, I have been directly involved in the matters leading up to these chapter 11 filings, including financial planning, forecasting, and the restructuring process. I also have been directly involved in negotiations with key creditor constituencies and the sale processes described herein. I am authorized to submit this declaration on behalf of the Debtors.

---

[1]    The Debtors, together with the last four digits of each Debtor's tax identification number, are: Malibu Lighting Corporation (8205); Outdoor Direct Corporation f/k/a The Brinkmann Corporation (9246); National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Company, Inc. (1153); Q-Beam Corporation (1560); Smoke 'N Pit Corporation (9951); Treasure Sensor Corporation (9938); and Stubbs Collections, Inc. (6615). The location of the Debtors' headquarters and service address is 4215 McEwen Road, Dallas, TX 75244.

[2]    Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

2.      I am a Senior Managing Director of Aurora Management Partners ("Aurora"). Aurora is a national turnaround consulting firm that provides turnaround, business and advisory and restructuring services over a multitude of industries and markets. Sample representations of Aurora include financial advisory services to a number of debtors, including CCI of West Palm (S.D. Fla.), Advanced Vending Systems (E.D. Tenn.), Summitville Tiles (N.D. Ohio), SKI Chalet (E.D. Va.), Shelby-Skipwith (W.D. Tenn.), Blue Thunder Auto Transport (N.D. Ga.), and Schirmers LLC (E.D. Va.); and financial advisory services to creditors' committees, including Foss Manufacturing (D.N.H.), Protected Vehicles (D.S.C.), Airnet Communications (M.D. Fla.), Red Shield Environmental (D. Me.), and Pike Nursery (N.D. Ga.).

3.      I graduated from the University of North Carolina at Chapel Hill in 1977 with a B.S. in Accounting. I am also a Certified Turnaround Professional. Since co-founding Aurora Management Partners in 2000, I have managed a wide variety of both turnaround and bankruptcy consulting engagements. I have managed workouts and divestitures across several industries, including product manufacturing businesses. I commenced my engagement with the Debtors in February, 2015. I have also served as the Chief Restructuring Officer in Prime Measurement (C.D. Cal.), Laich Industries Corp. (N.D. Ohio), and Brooks Food (W.D. Va.).

4.      Part I of this Declaration describes the different businesses of the Debtors and the developments that led to their filing for chapter 11 relief. Part II of this Declaration sets forth the relevant facts supporting the First Day Motions filed concurrently herewith and incorporates by reference the facts of the other First Day Motions.

2

## PART I

**B.      Corporate Organization and Ownership**

5.      A corporate chart showing the Debtors and certain of their non-debtor affiliates is attached hereto as **Exhibit A**. Debtors Malibu Lighting Corporation ("MLC") and Outdoor Direct Corporation f/k/a The Brinkmann Corporation ("ODC") are sister companies and are 100% owned by J. Baxter Brinkmann International Corporation ("JBBI"), which is not a Debtor. The sole shareholder of JBBI is Mr. J. Baxter Brinkmann (the "Principal"). MLC is a Delaware corporation and ODC is a Texas corporation. Debtor National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Corporation ("NCOC") is a subsidiary that is 100% owned by ODC. ODC also directly owns the following Debtor subsidiaries: Q-Beam Corporation; Smoke 'N Pit Corporation; and Treasure Sensor Corporation, each of which is a Texas corporation that does not have any active operations. Stubbs Collections, Inc. ("Stubbs"), a wholly-owned subsidiary of NCOC, is also a Texas Corporation and is in the process of liquidating its remaining inventory. As explained below, Stubbs has minimal operations aside from completing its inventory liquidation. Aside from NCOC, MLC, and ODC, the remaining Debtors have minimal assets.

6.      The Debtors also have one foreign subsidiary and foreign representative office. ODC owns non-debtor Brinkmann International (Hong Kong) Limited Company ("BIHKL"), a Hong Kong limited company, which in turn operates non-debtor Shanghai Representative Office of BIHKL, a Shanghai representative office ("BIHKL Shanghai").

3

C.    **Overview of the Debtors**

7.    As of the Petition Date, the Debtors have three primary lines of business, but are currently winding down two of these business lines. As more fully explained below, ODC and MLC are currently winding down their operations and liquidating their remaining assets. NCOC has entered into the NCOC Sale Agreement (as defined below) for the sale of substantially all of its operating assets. The NCOC Sale Agreement is subject to higher and better bids at auction. NCOC expects to continue its business operations in the ordinary course pending the closing of the sale.

(i)    **Malibu Lighting Corporation**

8.    MLC was established in 2009 and is headquartered in Dallas, Texas. MLC was a manufacturer and supplier of outdoor and landscape lighting products, such as solar and low voltage lights and home security lights, including the parts and accessories associated with these products. MLC is currently winding down operations after its principal customer. The Home Depot ("Home Depot") terminated its relationship with the company in July 2015. The majority of MLC's warehousing activities are at its facility in Kosciusko, Mississippi. MLC also has minimal warehouse activities in Dallas, Texas. Prior to the wind-down of its business, MLC had product development, design, manufacturing, and quality control operations in China. MLC's product was generally manufactured by third parties in China.

9.    MLC's assets currently consist primarily of inventory, accounts receivable, intellectual property, and equipment (the "MLC Assets"). The bulk of the MLC Assets are currently being marketed for sale by the Debtors' proposed investment banker, Piper

4

Jaffray & Co. ("PJC") and will also be separately marketed by Hilco IP Services LLC doing business as Hilco Streambank ("Hilco") postpetition.

**(ii)    ODC**

10.    ODC was established in 1975 and is headquartered in Dallas, Texas. ODC was a manufacturer and supplier of a variety of consumer goods, including (a) outdoor cooking products, such as outdoor gas grills, charcoal grills, smokers and fryers, (b) hand held lighting products, such as flashlights and spotlights, (c) landscape lighting products, and (d) parts and accessories associated with the foregoing products. ODC is currently winding down operations after its principal customer, Home Depot, terminated its relationship with the company in June, 2015. ODC leases three facilities located in Dallas, Texas (McEwen Road); Athens, Texas; and Shreveport, Louisiana. ODC also owns facilities in Olive Branch, Mississippi; Dallas, Texas (Simonton Road); and Keithville, Louisiana. Like MLC, ODC also previously had product development, design, manufacturing, and quality control operations in China. ODC's product was primarily manufactured by third parties in China. ODC also formerly manufactured outdoor cooking products at its facility in Shreveport, Louisiana.

11.    ODC's primary assets consist of accounts receivable, inventory, its owned real estate in Olive Branch, Mississippi; Dallas (Simonton Road) Texas; and Keithville, Louisiana, accounts receivable, intellectual property, inventory, and equipment (the "ODC Assets). PJC is also marketing the ODC Assets for sale, either separately or potentially through a bulk sale with MLC Assets. The ODC Assets also will be separately market by Hilco postpetition.

5

### (iii)   **NCOC**

12.     NCOC was established in 1988 and is headquartered in Dallas, Texas. NCOC is a leading manufacturer and supplier of both branded and private label pet bedding and pet accessory products.  NCOC manufactures beds, accessories, and deodorizers for dogs as well as beds, scratching posts, and toys for cats.  In addition, NCOC markets and sells boat covers manufactured primarily from Chinese suppliers.

13.     NCOC is a wholly-owned subsidiary of ODC.  Stubbs is a wholly-owned subsidiary of NCOC.  Stubbs formerly manufactured western clothing wear, but does not currently manufacture any product.  Stubbs is in the process of liquidating its remaining inventory and has minimal expenses and revenues, having generated only approximately $165,000 in sales last year.  Stubbs' most substantial asset consists of the remaining clothing inventory that it is currently liquidating.

14.     NCOC maintains fulfillment and warehouse facilities totaling approximately 440,000 square feet of warehouse space in Athens, Texas that it rents from non-debtor JBBI and an outside third party lessee.  NCOC also has product development, design, manufacturing, and quality control operations in China.  NCOC designs, manufactures, and markets its products through national big box retailers, national and regional discount stores, wholesale clubs, sporting goods stores, drug stores, grocery stores, catalog showrooms, marine outlets, pet distributors, mail-order catalogues, and online retailers.  A number of NCOC's products are sourced and manufactured, in whole or in part, overseas, but certain manufacturing and assembly is performed in Athens, Texas.  NCOC also operates an outlet store in Athens,

Texas that sells products manufactured by NCOC, ODC and MLC (the "Retail Store").  The
Retail Store generally averages between $5,000 and $6,000 in weekly deposits for the three days
a week the store is open.

      15.    NCOC is a profitable company.  For the fiscal year ending January 31,
2105, NCOC generated $117.8 million in gross sales and positive EBIDTA of $9.6 million on a
stand-alone basis.  NCOC reported net income of $5.4 million for the fiscal year 2014.

### (iv)    Foreign Subsidiaries

      16.    As noted above, ODC owns BIHKL, which operates a representative
office in China through BIHKL Shanghai.  BIHKL currently employs two people while BIHKL
Shanghai employs approximately six people. Originally, BIHKL was established to service the
needs of ODC with respect to its Chinese suppliers.  BIHKL Shanghai currently provides quality
control, auditing, and logistical services with respect to the manufacture and shipment of goods
from China to NCOC or its customers.  The Debtors are legally required to maintain BIHKL (or
a similar entity in Hong Kong) in order to maintain BIHKL Shanghai.  It is anticipated that
BIHKL and BIHKL Shanghai will continue to operate pending a sale of NCOC's assets and
thereafter under a transition services agreement until the buyer of NCOC's assets establishes a
Shanghai representative office of its own.

### D.    Intercompany Transactions

      17.    Historically, certain Debtors and/or their ultimate parent, JBBI, provided
and/or paid for services that were shared by and among certain Debtor and non-debtor entities,
such as corporate overhead, insurance, and employee/payroll services.  Because the Debtors are

under common ownership and often had overlapping operations at various facilities, it was

expedient for one Debtor to provide common services on behalf of other related entities. As a

result, several of the Debtors have significant prepetition intercompany account receivables

against one another as well as against JBBI.

18.    When it became evident that ODC and MLC would be liquidated and

NCOC would be sold separately as a going concern, the Debtors successfully disaggregated

several common functions that are now separately performed by MLC, ODC, and NCOC,

respectively. However, it was not feasible to disaggregate certain shared services that will

continue postpetition (the "Shared Services"). The Shared Services include certain overhead

expenses, such as insurance and employee benefits. Additional Shared Services relate to

services by employees of one Debtor who provide crossover services that benefit other Debtors,

including accounting, human resources, legal and risk management services, customer relations,

sales, and marketing.

19.    The Debtors have allocated most of the Shared Services by the respective

gross sales of each of ODC, MLC, and NCOC. Certain Shared Services, such as human

resources and employee benefits, are allocated by headcount of each of ODC, MLC, and NCOC.

Through such allocations, each of these Debtors will pay for the amount of Shared Services

allocated to it as reflected in the respective budgets attached to the (i) *Interim Order as to Debtor*

*National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Company, Inc. (a)*

*Authorizing Post-Petition Financing and Use of cash Collateral, (b) Granting §§ 363(c) and*

*364(d) Liens, a Superpriority Administrative Claim, and Adequate Protection, (c) Approving*

8

*Agreements with Comerica Bank, and (d) Setting a Final Hearing* (the "NCOC Financing Order"); (ii) *Interim Order As to Malibu Lighting Corporation Approving Stipulation Authorizing Debtor's Use of Cash Collateral* (the "MLC Cash Collateral Order"); and (iii) *Interim Order Approving Stipulation Authorizing Use of Cash Collateral by Debtors Outdoor Direct Corporation f/k/a The Brinkmann Corporation and Other Syndicated Facility Obligors and Setting Final Hearing Thereon* (the "ODC Cash Collateral Order" and together with the NCOC Financing Order and the MLC Cash Collateral Order, the "Financing Orders").

### E.    Summary of Prepetition Debt

20.    The Debtors are parties to certain secured financing arrangements with various lenders, as summarized below:

### (i)    MLC Credit Agreement and Term Note

21.    Prior to the Petition Date, MLC and Comerica entered into that certain *Credit Agreement* as of December 15, 2009, as amended (the "MLC Comerica Credit Agreement"). The MLC Comerica Credit Agreement is a revolving credit agreement secured by substantially all of the assets of MLC. The obligations under the MLC Comerica Credit Agreement are also guaranteed by Debtor National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Corporation. As of October 6, 2015, Comerica is owed $2,626,671.88 in principal obligations, plus accrued interest and fees, under the MLC Comerica Credit Agreement.

22.    MLC is also a party to that certain *Term Note*, dated as of November 14, 2014 (the "MLC Comerica Term Note"). MLC is the only obligor under the MLC Comerica

Term Note, which is secured by substantially all of MLC's assets and by two tracts of land in

Texas owned by MLC's non-debtor affiliate, South 720, L.P., which entity is owned by the

Principal.  In addition, the MLC Comerica Term Note is guaranteed by the Principal personally

for up to $3.4 million in principal.  As of October 6, 2015, Comerica is owed $2,455,555.60 in

principal obligations, plus accrued interest and fees, under the MLC Comerica Term Note.

  **(ii)**   **ODC BofA Credit Agreement and LC Agreement**

  23.   Prior to the Petition Date, ODC entered into that certain *Amended and

Restated Credit Agreement*, dated as of March 9, 2012, as amended (the "ODC BofA Credit

Agreement"), by and between ODC and Bank of America, N.A., as administrative agent (the

"Administrative Agent"), and the lenders thereto (collectively, the "Lenders").  ODC and Bank

of America, N.A., as issuer, are also parties to that certain L/C Credit Agreement dated May 1,

2012 between ODC and the Issuer (the "ODC L/C Credit Agreement").  The ODC BofA Credit

Agreement is both a revolving and term loan credit facility.  The ODC L/C Credit Agreement

provides for the issuance of certain letters of credit.

  24.   Debtors NCOC; Q-Beam Corporation; Smoke 'N Pit Corporation;

Treasure Sensor Corporation; and Stubbs are each guarantors of the obligations under the ODC

BofA Credit Agreement (collectively the "BofA Credit Agreement Guarantors").[3]  ODC and

each of the BofA Credit Agreement Guarantors pledged their respective assets to secure their

guaranty obligations under the ODC BofA Credit Agreement.  ODC also assigned to the

---

[3]   Pursuant to the Intercreditor Agreement, NCOC's guaranty obligations under the BofA Credit Agreement are junior to NCOC's obligations to Comerica Bank under the NCOC Comerica Credit Agreement (as defined below).

Administrative Agent a Promissory Note dated as of October 31, 2013, in the amount of $30 million issued by JBBI to ODC.

25.     As of October 7, 2015, the indebtedness outstanding under the ODC BofA Credit Agreement is not less than $44,413,950.20, consisting of principal in the amount of $44,060,185.37 and accrued and unpaid interest in the amount of $353,764.83.  As of October 7, 2015, the indebtedness outstanding under the ODC L/C Credit Agreement consists of a contingent obligation related to an outstanding letter of credit in the amount of $8,229.60.

**(iii)    NCOC Comerica Credit Agreement**

26.     NCOC is a party to that certain *Amended and Restated Credit Agreement*, dated as of June 30, 2013, as amended, between NCOC and Comerica Bank (the "NCOC Comerica Credit Agreement").  NCOC is the only obligor under the NCOC Comerica Credit Agreement, which is secured by substantially all of NCOC's assets.  As of October 5, 2015, Comerica is owed approximately $25,801,582.89 in principal obligations, plus accrued interest and fees, under the NCOC Comerica Credit Agreement (also referenced herein as the "Lender Pre-Petition Debt").

27.     NCOC is also a guarantor of the obligations under the BofA Credit Agreement in favor of Bank of America, N.A., as administrative agent (the "Guaranty Agent").[4] The Guaranty Agent holds security interests and liens in substantially all of the Debtor's assets (the "Guaranty Collateral").  The Guaranty Collateral secures all indebtedness owed by the

---

[4] Pursuant to an intercreditor agreement, NCOC's guaranty obligations under the BofA Credit Agreement are junior to NCOC's obligations to Comerica Bank under the NCOC Comerica Credit Agreement.

Debtor under the Guaranty Loan Documents (as defined in the Interim Order).  Such

indebtedness is referred to as the "Guaranty Indebtedness."  The Guaranty Indebtedness, as of

October 7, 2015, is not less than $44,413,950.20, consisting of principal in the amount of

$44,060,185.37 and accrued and unpaid interest in the amount of $353,764.83.

    **(iv)**    **Unsecured Obligations**

    28.    The Debtors incur trade debt in the ordinary course of their business. As of

the Petition Date, the Debtors owe estimated amounts to third party vendors on account of

ordinary course unsecured obligations approximately as follows:  $4,273,000 by ODC,

$17,738,000 by NCOC and $8,528,000 by MLC.  The foregoing does not include any disputed

litigation claims.

**F.**    **Prepetition Marketing and Sale Efforts**

    29.    The Debtors filed these chapter 11 cases in order to effectuate an orderly

disposition of their assets in a manner that will maximize recoveries by all constituents,

including a going concern sale of the operating assets of NCOC and orderly liquidation sales of

assets of MLC and ODC.

    **(i)**    **Going Concern Marketing and Sale Process –**
          **Ultimately, Only NCOC Will Remain a Going Concern**

    30.    The Debtors commenced the process of evaluating restructuring and sale

options in March 2015 with the hiring of Piper Jaffray & Co. ("PJC") as its exclusive investment

banker.  Under the terms of its agreement, PJC explored a sale or capital placement transaction

for the Debtors.  On March 27, 2015, as directed by the Board of Directors of the Debtors, PJC

began contacting parties to determine their interest in the acquisition of or investment in the

Debtors, either together or as separate companies. Specifically, PJC contacted 165 potential bidders, representing both financial and strategic potential buyers. Of these contacted bidders, 134 either reviewed a teaser document or participated in high-level discussions about the transaction, 87 of which ultimately negotiated confidentiality agreements and were provided a Confidential Information Memorandum. Interested parties were asked to participate in an initial discussion with PJC to hear about the opportunity and ask questions about the Debtors' assets. Parties that demonstrated sufficient interest in the transaction were then given access to further initial due diligence information via a virtual data room (36 parties to date).

31.     Between April and June, 2015, 23 parties provided verbal or written indications of interest and 15 of the highest bidders were invited to more detailed diligence discussions and presentations with management. Subsequent to these discussions and presentations, these parties were given access to additional due diligence information via a virtual data room and follow up discussions, and were asked to provide written letters of intent for the Board of Directors to consider by June 2, 2015. By early June 2015, PJC had received 13 letters of intent. At this time, MLC and ODC were operating as going concern entities and, consequently, PJC solicited and received letters of intent for different combinations of the Debtors, as well as bids for all Debtor assets together.

32.     Subsequent to receiving these letters of intent, the Debtors received notice that Home Depot terminated its relationships with MLC and ODC. At the direction of the Debtors' Board of Directors, PJC re-approached interested parties to determine interest for the Debtors' assets without the go-forward relationship with MLC's and ODC's major customer.

13

Buyers expressed a lack of interest in moving forward with a purchase of MLC's and ODC's assets at that time. After reapproaching interested parties, the Debtors observed a considerable decrease in interest in the MLC and ODC from prospective parties as a result of the terminated relationships with Home Depot. As a result, the Debtors refocused the sale process for NCOC as a separate entity. PJC reached out to all parties who had expressed interest in NCOC on a stand-alone basis or as the key area of focus for the formerly consolidated sale process. PJC, Aurora and the Debtors' management team held follow up due diligence conversations with several interested parties in mid-June and early July. During this time frame, many parties expressed to PJC an interest in participating in an auction process for NCOC in order to provide certainty and the opportunity to purchase the assets free and clear of all liens. Of parties with continued interest, Summit Investment Management emerged as the highest and best bid, with the ability to reduce risk of further process uncertainty.

33.     On August 20, 2015, NCOC entered into a non-binding letter of intent with Summit Investment Management LLC ("Summit") regarding a sale of substantially all of NCOC's operating assets, plus the assumption of certain liabilities. Summit's letter of intent provided an exclusivity provision that expired on September 14, 2015, but this provision permitted NCOC's representatives to continue to provide due diligence information to, and have discussions with, prospective purchasers who had already been included in the process and those who reached out to NCOC during the exclusivity period. This structure has allowed PJC to provide updated and additional information to potential interested parties to consider submitting an overbid in an auction process.

14

34.     NCOC entered into that certain *Asset Purchase Agreement*, dated October 7, 2015 (the "NCOC Sale Agreement") with DMC Acquisition Holdings, LLC (the "Stalking Horse"), an affiliate of Summit.  Under the NCOC Sale Agreement, substantially all of NCOC's operating assets will be sold to the Stalking Horse in consideration of a purchase price of $36,850,000, plus the assumption of certain liabilities.  The NCOC Sale Agreement is subject to higher and better bids and, ultimately, the approval of this Court.

**(ii)     Liquidation Sales of MLC and ODC**

35.     MLC and ODC are in the midst of winding down their operations and liquidating their assets – a process that began prepetition.  PJC marketed the ODC Assets and the MLC Assets.  Following Home Depot's termination of its relationships with ODC and MLC, respectively, PJC, the direction of the Debtors' Board of Directors, PJC reapproached interested parties to determine go forward interest for the Debtors' assets without the go forward relationship with ODC's and MLC's major customer.  Given the high level of customer concentration at Home Depot for both MLC and ODC, this development significantly changed buyers' views of the business as a going concern.  Ongoing uncertainty about the remainder of the 2016 calendar season and the MLC's and ODC's ability to sell through inventory, as well as doubts about the Debtors' ability to replace any substantive amount of the lost projected business for the next season led most parties to exit the process entirely.  Remaining parties have expressed continued interest in accounts receivable, inventory, intellectual property, tooling and other select assets in different combinations.  PJC, Aurora, and the Debtors' management have continued to provide due diligence information and discussions to prospective buyers; however,

15

no parties have yet put forth a credible bid for any portion of the assets that exceeds or equals

liquidation value.[5]   Postpetition, the Debtors intend to continue to market the ODC Asset and

MLC Assets through the separate marketing and sale efforts of PJC and Hilco.

**PART II**

A.    **First Day Motions**

36.    In order to enable the Debtors to minimize the adverse effects of the

commencement of these chapter 11 cases, the Debtors have requested various types of relief in

the First Day Motions filed concurrently with this Declaration.

37.    I have reviewed each of the First Day Motions (including the exhibits and

schedules thereto), and I incorporate by reference the factual statements set forth therein.  The

facts stated in the First Day Motions are true and correct to the best of my knowledge,

information, and belief, and I believe that the type of relief sought in each of the First Day

Motions is:  (a) necessary to enable the Debtors to operate under chapter 11 with minimal

disruption; and (b) essential to maximizing the value of the Debtors' assets for the benefit of

their estates and creditors.

38.    It is my further belief that, with respect to those First Day Motions

requesting authority to pay prepetition claims or to continue selected prepetition programs, the

relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases

and avoid immediate and irreparable harm to the Debtors and their estates.

---

[5] In addition to the ODC Assets and MLC Assets, ODC and MLC are also in the process of liquidating obsolete inventory, including barbecue grills, outdoor lighting fixtures, camping gear, and related accessories (the "Obsolete Inventory").  The Debtors intend to continue and complete the liquidation of the Obsolete Inventory postpetition.

39.     I believe that any diminution in the relief requested in the First Day

Motions could have an immediate and irreparably harmful impact upon the value of these estates

to the detriment of all of the Debtors' constituencies.  Specifically, the Debtors believe that

payment of the prepetition claims identified in the First Day Motions will forestall such

irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief

requested therein.

**B.     Motion of Debtor National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Company, Inc. for Entry of Interim and Final Orders (A) Authorizing Post-Petition Financing and Use of Cash Collateral, (B) Granting 363(c) and 364(d) Liens, a Superpriority Administrative Claim, and Adequate Protection, (C) Approving Agreements with Comerica Bank, and (D) Setting a Final Hearing (the "NCOC Financing Motion")**

40.     By the NCOC Financing Motion, Debtor NCOC seeks authority to

borrow up to $21,500,000, of which $11,000,000 would be available on an interim basis,

from Comerica, and to use cash collateral and grant adequate protection to NCOC's prepetition

lenders.

41.     NCOC has an urgent and immediate need to obtain postpetition financing.

NCOC does not have sufficient funds on hand or generated from its business to fund its

operations, particularly the need to purchase new inventory.  Without the proposed postpetition

financing and the use of cash collateral as set forth in the Interim Order, NCOC would not be

able to maintain its going concern value or to effectuate an orderly sale process that would

maximize value for all constituents.

42.     Specifically, without the proposed credit facility and access to cash

collateral, NCOC will not have the liquidity to operate its business, purchase new inventory,

17

fund its ordinary course expenditures, including paying its employees and the expenses necessary to administer the chapter 11 case, pending the contemplated sale of NCOC's assets. Absent adequate funding, NCOC would be required to cease operations and liquidate on a piecemeal basis, causing irreparable harm to NCOC and its estate. Accordingly, NCOC has an urgent and immediate need for the DIP Facility and entry of the Interim Order.

43.     NCOC sought and was unable to obtain financing from other sources on terms preferable to the proposed DIP Facility. NCOC does not believe that it is able to obtain postpetition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those described herein. The DIP Facility was negotiated in good faith and at arm's length, and extensively and diligently considered by NCOC. The Debtor believes that the proposed terms of the DIP Facility are fair and reasonable in light of current market conditions and is in the best interests of NCOC's estate. Moreover, by entering into the DIP Facility with its prepetition secured lender, Comerica, and having been able to negotiate adequate protection arrangements with the Guaranty Agent, NCOC has eliminated any unnecessary priming fight with its prepetition secured lenders.

44.     The urgent need to preserve NCOC's business, and avoid immediate and irreparable harm to NCOC's estate, makes it imperative that NCOC be authorized to obtain postpetition financing and use cash collateral as of the Petition Date, pending the Final Hearing, in order to continue its operations and administer NCOC's chapter 11 case.

45.     For the foregoing reasons, NCOC has determined, in the exercise of its sound business judgment, that NCOC requires financing under the terms of the DIP facility and

18

the use of cash collateral pursuant to the terms and conditions of the Interim Order, and hereby

requests approval of the DIP Loan Note and the DIP Financing Agreement.

**C.    Motion for Entry of Interim and Final Orders (1) Approving Stipulation As to Malibu Lighting Corporation Authorizing Use of Cash Collateral, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay, and (4) Granting Related Relief (the "MLC Cash Collateral Motion")**

46.    By MLC Cash Collateral Motion, Debtor MLC requests that the Court

approve the *Stipulation As to Malibu Lighting Corporation Authorizing Use of Cash Collateral*

(the "MLC Stipulation").  MLC also seeks entry of interim and final orders authorizing use of

cash collateral, provision of adequate protection for Comerica, and modification of the automatic

stay, all in accordance with the MLC Stipulation.  The MLC Stipulation was negotiated in good

faith and at arms' length with Comerica.

47.    Without the use of cash collateral as set forth in the MLC Stipulation,

MLC would not be able to continue its orderly liquidation process or to maximize the value of its

estate.

48.    Specifically, without access to cash collateral, MLC will not have funding

to satisfy its liquidation-related expenditures, including paying its employees or the expenses

necessary to administer the chapter 11 case, pending the contemplated sale of MLC's assets.

Absent adequate funding, MLC would be required to convert its case to chapter 7 and liquidate

on a piecemeal basis without the benefit of knowledgeable staff (resulting in substantially lower

sale proceeds than those that may be realized through orderly section 363 sales), causing

irreparable harm to MLC and its estate.  Accordingly, MLC has an urgent and immediate need

for cash collateral and approval of the MLC Stipulation on an interim basis.

D.    **Motion for Entry of Interim and Final Orders (1) Approving Stipulation Authorizing Use of Cash Collateral by Debtors Outdoor Direct Corporation, f/k/a The Brinkmann Corporation and Other Syndicated Facility Obligors, (2) Granting Adequate Protection, (3) Modifying the Automatic Stay, and (4) Granting Related Relief (the "ODC Cash Collateral Motion")**

49.    By ODC Cash Collateral Motion, Debtors ODC, Q-Beam Corporation, Smoke 'N Pit Corporation, Treasure Sensor Corporation, and Stubbs Collections, Inc., five of the above-captioned debtors and debtors in possession (together, the "Syndicated Facility Debtors"), request that the Court approve the *Stipulation Authorizing Use of Cash Collateral by Debtors Outdoor Direct Corporation f/k/a The Brinkmann Corporation and Other Syndicated Facility Obligors* (the "ODC Stipulation"). The Syndicated Facility Debtors also seek entry of interim and final orders authorizing use of cash collateral, provision of adequate protection for the Agent and the Issuer (as defined in the ODC Stipulation), and modification of the automatic stay, all in accordance with the ODC Stipulation. The ODC Stipulation was negotiated in good faith and at arms' length with the Agent and the Issuer.

50.    Without the use of cash collateral as set forth in the ODC Stipulation, the Syndicated Facility Debtors would not be able to continue its orderly liquidation process or to maximize the value of its estate.

51.    Specifically, without access to cash collateral, the Syndicated Facility Debtors will not have funding to satisfy their liquidation-related expenditures, including paying their employees or the expenses necessary to administer their chapter 11 cases, pending the contemplated sale of the Syndicated Facility Debtors' assets. Absent adequate funding, the Syndicated Facility Debtors would be required to convert their cases to chapter 7 and liquidate on a piecemeal basis without the benefit of knowledgeable staff (resulting in substantially lower

20

sale proceeds than those that may be realized through orderly section 363 sales), causing

irreparable harm to the Syndicated Facility Debtors and their estates. Accordingly, the

Syndicated Facility Debtors have an urgent and immediate need for cash collateral and approval

of the ODC Stipulation on an interim basis.

E.    **Motion of Debtors for Order Under Sections 105, 345, 363, 503(b), 1107 and 1108 of the Bankruptcy Code Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continuance of Existing Cash Management Systems, Bank Accounts, Checks and Related Business Forms, (III) Performance of Intercompany Transactions and Providing Administrative Priority Status to Postpetition Intercompany Transactions; and (IV) Related Relief ("Cash Management Motion")**

52.    Pursuant to the Cash Management Motion, the Debtors request

authorization for the (i) maintenance of their existing bank accounts including the authority to

pay routine prepetition banking fees owed to financial institutions, (ii) continued use of each of

their existing cash management systems, and (iii) continued performance of intercompany

transactions and provision of administrative priority to postpetition intercompany receivables,

among other relief requested. Each Debtor's cash management system is described in the Cash

Management Motion (collectively, the "Cash Management Systems")

53.    The Debtors' Bank Accounts as listed on Exhibit A to the Cash

Management Motion are part of a carefully constructed automated cash management system that

ensures the Debtors' ability to efficiently monitor and control all of their cash receipts and

disbursements. I believe closing the existing Bank Accounts and opening new accounts would

disrupt the Debtors' businesses and result in delays impeding the Debtors' ability to transition

smoothly into chapter 11, and would likewise jeopardize the Debtors' efforts to successfully

reorganize in a timely and efficient manner.

21

54.    I am informed that, upon the filing of a petition for relief under chapter 11 of the Bankruptcy Code, debtors in possession are normally required by the U.S. Trustee Operating Guidelines to (i) close all of their existing bank accounts and (ii) open new "debtors in possession" bank accounts.  If strictly enforced in this case, the United States Trustee's requirements would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under chapter 11.  Accordingly, the Debtors seek a waiver of these requirements to the extent set forth in the Cash Management Motion.

55.    The cash management procedures utilized by the Debtors are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises.  The Cash Management Systems provide significant benefits to the Debtors, including the ability to control corporate funds centrally, segregate cash flows, ensure availability of funds when necessary, and reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

56.    The operation of the Debtors' business requires that the Cash Management Systems continue during the pendency of these cases.  Requiring each of the Debtors to adopt new cash management systems at this critical stage of these cases would be expensive, would create unnecessary administrative burdens and problems (including the possibility that transactions might not be adequately documented), and would likely disrupt and adversely impact the Debtors' ability to reorganize successfully.  Indeed, requiring Cash Management Systems' changes could irreparably harm the Debtors, their estates and their creditors by creating

22

cash flow interruptions while systems were changed.  I believe that maintenance of the existing

Cash Management Systems and granting the relief requested in the motion is therefore in the best

interests of all creditors and other parties-in-interest.

**F.**   **Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment ("Utility Motion")**

57.     Pursuant to the Utility Motion, the Debtors request entry of an order (a)

prohibiting the Utility Providers from altering, refusing or discontinuing service; (b) deeming the

Utility Providers adequately assured of future performance; and (c) establishing procedures for

determining additional adequate assurance of future payment.

58.     The Debtors receive essential utility services from a number of utility

companies.  In the normal course of their daily business operations, the Debtors have

relationships with various utility companies and other providers (each a "Utility Provider" and

collectively, the "Utility Providers") for the provision of telephone, cellular phone, gas,

electricity, water, trash and other related services.  NCOC, ODC, and MLC will each provide

deposits based on their estimated utility usage during these cases that together will comprise the

aggregate utility deposit provided in the Utility Motion, consistent with the Financing Orders.

The deposits equal to 50% of the Debtors' estimated cost of their monthly utility consumption.

59.     At this critical time, and given the nature of the Debtors' business,

continued and uninterrupted utility service is essential to the Debtors' ongoing operations.  The

Debtors use the power generated by the utilities to run their systems and operate their facilities,

which is engaged in the production of modules.  If the Debtors lost any utility service at their

23

business sites, the Debtors would be unable to operate, causing immediate and irreparable harm. It is therefore critical that the Court prohibit the Utility Providers from altering, refusing, or discontinuing service to the Debtors.  Therefore, I believe the relief requested in the utilities motion is essential to these estates.

G.      **Motion Pursuant to Sections 105(a), 507(a)(8), And 541(d) of the Bankruptcy Code for an Order (I) Authorizing the Payment of Prepetition Sales, Use and Similar Taxes and Fees and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic <u>Payment Requests Made Relating to the Foregoing ("Sales & Use Tax Motion")</u>**

60.      Pursuant to the Sales & Use Tax Motion, the Debtors request entry of an order authorizing payment of prepetition sales & use taxes to the certain taxing authorities or to the parties who ordinarily collect sales and use taxes in the ordinary course of the Debtors' businesses.

61.      I am informed that any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.  I am informed that the Debtors' failure to remit the prepetition sales and use Taxes and business fees could adversely affect the Debtors' business operations because, among other things (a) the initiation of audits of the Debtors or prevent the Debtors from continuing their businesses and administering their estates, which, even if unsuccessful, would unnecessarily divert the Debtors' attention from the process of maximizing the value of their estates; (b) taxing authorities' attempted suspension the Debtors' operations, and pursue other remedies that will harm the estates; (c) attempts by taxing

authorities to seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtors do not pay the sales and use taxes and/or business fees. The Debtors have locations over a variety of States and any disputes that could adversely affect their ability to operate in a particular jurisdiction could have wide-ranging and negative effects on the Debtors' operations as a whole and their efforts to efficiently administer their estates and maximize distributions to their creditors.

62.     Accordingly, on behalf of the Debtors, I respectfully submit that the Sales & Use Tax Motion should be approved.

**H.    Motion for the Entry of an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests ("Wage Motion")**

63.     The Wage Motion seeks authority to pay and honor wages owed to the Debtors' employees (the "Employees"), as well as to honor employee benefit and welfare programs offered in the ordinary course of business as described in the Wage Motion (the "Employee Wages and Benefits")

64.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these chapter 11 cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Employee Wages and Benefits, as described herein, is necessary to maintain the

25

Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

65.    Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses.  These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Employee Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business.  Moreover, the Debtors believe that if they are unable to honor accrued Employee Wages and the Benefits described above, including honoring holiday and vacation time, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.  The Debtors believe that any uncertainty with regard to continuation of Employee Wages and Benefits will cause significant anxiety at precisely the time the Debtors needs their Employees to perform their jobs at peak efficiency.

66.    Accordingly, on behalf of the Debtors, I respectfully submit that the Wage Motion should be approved.

**I.    Motion of Debtors for an Order Authorizing, But Not Directing, Payment of Certain Prepetition Shipping Obligations in the Ordinary Course of Business ("Shipping Motion ")**

67.    Pursuant to the Shipping Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors, in their business judgment (but subject to the Financing Orders), to pay prepetition obligations owed to various shipping companies, customs agents, freight forwarders, foreign vendors, and shipping brokers or agents (collectively, the "Shippers") for shipping charges incurred by the Debtors, including those that give rise (or

26

legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtors to such Shippers for services performed and/or goods that were delivered to the Debtors prior to the Petition Date (collectively, the "Shipping Obligations").

68.     Almost all of the Shipping Obligations subject to the Shipping Motion relate to sustaining the continued operation of NCOC, and consequently will be paid under the budget attached to the NCOC Financing Order.  Debtors ODC and MLC are winding down their operations and are neither ordering nor manufacturing any products.  However, ODC and MLC may still owe small amounts to U.S. Customs that would be paid in accordance with the ODC Cash Collateral Order and MLC Cash Collateral Order, as applicable.

69.     NCOC has an intricate network of foreign vendors, shippers, freight forwarders, common carriers and warehouses that they depend on in order to obtain and transport its products for sale to their customers.  NCOC manufactures products for its specific customers, including imprinting customer labels and marks on pet products.  The months of October, November and December are when NCOC derives the largest amount of its sales as customers purchase products for the upcoming holidays and in preparation for the coming winter.  Thus, NCOC must avoid any delays or disruptions to its shipping operations to ensure the products in production, shipment and storage are timely delivered to NCOC's customers.  If NCOC cannot guarantee the manufacture and delivery of the products currently in the hands of the Shippers, it cannot meet its customer obligations at the most important time of the year for NCOC's sales.

27

70.     Because NCOC's ongoing business depends on the supply of certain products, even minor disruptions in the shipping process could be disastrous for the going concern value of NCOC's business.  Even absent a valid lien, a Shipper's mere possession (and retention) of NCOC's products could severely disrupt NCOC's operations and prevent delivery of goods to NCOC's customers.  Accordingly, by this Motion, NCOC requests authority (subject to and consistent with the terms of the NCOC Financing Order) to pay certain prepetition claims relating to the Shippers that NCOC determines is necessary or appropriate to (a) obtain release of critical or valuable products that may be subject to liens or the claims of the NCOC's foreign vendors, (b) maintain a reliable, efficient and smooth shipping system, and (c) induce the Shippers to continue to carry product and make timely delivery.  Notably, NCOC only seeks authority, not direction, to make such payments.

71.     NCOC's business depends on the timely and accurate shipping of products to operate successfully.  Any disruption in the shipping process would necessarily damage the value of NCOC's business.  In addition, NCOC cannot replace the existing Shippers without significant disruption to their business as NCOC relies on its arrangements with Shippers and need such arrangements to remain intact by making timely payment of the Shipping Obligations.

72.     NCOC believes that the relief requested herein will ensure a continued supply of products that are vital to NCOC's continued operations and essential to preserving the value of its business.  Absent the relief requested in the Motion, NCOC will be required to expend substantial time and resources (i) convincing those parties holding goods that they should not assert a lien on or hold goods in transit, (ii) attempting to persuade the Shippers and Foreign

28

Vendors to release goods held and/or not detain future shipments, (iii) locate replacement shippers for those that cease doing business with NCOC, (iv) convincing the Shippers and Foreign Vendors of NCOC's authority and ability to make certain payments. Assuming it is even possible for NCOC to accomplish the tasks above, the attendant disruption in the continuous flow of products will disrupt NCOC's operations and damage the value of NCOC's business.

73.     Accordingly, on behalf of the Debtors, I respectfully submit that the Shipping Motion should be approved.

**J.      Debtors' Motion for Entry of an Order Authorizing Debtors to Pay Prepetition Claims of Critical Vendors and Granting Related Relief ("Critical Vendor Motion")**

74.     NCOC primarily assembles pet bedding and prepares the assembled pet bedding for shipment to its clients. NCOC relies on its vendors for a continuous supply of materials in order to assemble the pet bedding and prepare it for shipping. The uninterrupted supply of NCOC's raw materials is especially important at this time of year, as NCOC's manufacturing lines ramp up in anticipation of the holiday season.

75.     Absent assurance of immediate payment either in part or in whole, the Critical Vendors could refuse to deliver goods to NCOC. NCOC believes that it would be extremely difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to NCOC's business. As discussed above, NCOC is in the midst of ramping up its production lines for the holiday season. At this critical time of the year, uninterrupted access to the Critical Vendors' supplies is paramount and any interruption would

29

severely impact NCOC's business.  Such harm would likely far outweigh the cost of payment of

the Critical Vendor Claims.

76.    Given the importance of the services provided by the Critical Vendors, it

is imperative that the Debtors be granted, on an emergency basis, the flexibility and authority to

satisfy the prepetition claims of the Critical Vendors, as any disruption in NCOC's ability to

provide services to their customers would cause immediate and irreparable damage to NCOC's

business.

**K.     Motion of Debtor National Consumer Outdoors
       Corporation f/k/a Dallas Manufacturing Corporation for
       Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a),
       and 1108 of the Bankruptcy Code Authorizing the Honoring of Prepetition
       Obligations to Customers and to Otherwise Continue Customer Practices
       and Programs in the Ordinary Course of Business ("Customer Programs Motion")**

77.    NCOC's existing Customer Programs consist of a variety of Customer

incentives, including, cash discount allowances, advertising and promotional allowances, volume

rebates, adjustments to Customer invoices for, among other things, deviations from the terms of

the applicable Customer agreement, merchandise markdown, and defective or non-conforming

merchandise.  In general, the Debtors negotiate specific Customer Programs on a Customer by

Customer basis.

78.    The loyalty and continued patronage of NCOC's Customers is critical to

NCOC's goal of maximizing the value of its estate.  If the Customer Programs are not honored in

the ordinary course of business, Customers may leave and terminate future services, or reduce

orders of NCOC's products.  At this critical early state, NCOC simply cannot risk any loss of

Customer confidence as a result of its failure to honor prepetition obligations to Customers or

30

discontinuing its Customer Programs.  The relief requested herein will protect NCOC's goodwill

during this critical time and enhance NCOC's ability to generate revenue.

79.     NCOC needs to continue those Customer Programs postpetition that have

been cost-effective and beneficial to its business and, in connection therewith, seeks authority to

honor its prepetition obligations with respect to Customer Programs.  Such relief is necessary to

preserve NCOC's critical Customer relationships and goodwill in order to continue to operate

and effectuate the sale of its business to the Stalking Horse, or alternative buyer.  For the reasons

set forth herein, it is in the best interest of NCOC, its estate and creditors, to honor, in NCOC's

discretion, the customer programs described in the Customer Program Motion, and to continue

the Customer Programs in the ordinary course of business.

80.     Accordingly, on behalf of the Debtors, I respectfully submit that the

Customer Programs Motion should be approved.

**L.**     **Motion of the Debtors for Order (A) Authorizing the**
        **Debtors to (I) Maintain and Renew Existing Insurance Policies;**
        **(II) Continue Insurance Premium Financing Programs, (III) Pay Insurance**
        **Premium Financing Obligations Arising Thereunder, and (B) Authorizing Financial**
        **Institutions to Honor All Obligations Related Thereto ("Insurance Financing Motion")**

81.    6.     In the ordinary course of the Debtors' business, the Debtors

maintain numerous insurance policies providing coverage for, *inter alia*, stock throughput,

general liability, excess liability, international, property, directors and officers liability, workers

compensation, and fidelity and surety bonds (collectively, the "Policies").  A summary of the

Debtors' policies by type, carrier, and term is set forth on the "Schedule of Policies" annexed to

attached to the Insurance Premium Motion as Exhibit A.  These Policies are essential to the

preservation of the Debtors' assets.  Specifically, the Policies are necessary to protect NCOC's

31

business and assets during its going concern sale. In addition, the Policies are necessary to the preservation of MLC's and ODC's assets, as they wind down pursuant to an orderly liquidation. Moreover, in many instances, insurance coverage is required by regulation, law, or contract that governs the Debtors' different businesses.

82.    The Policies provide the Debtors with essential insurance coverage. Any lapse in the coverage to be provided under the Policies could expose the Debtors to substantial liability, monetary and otherwise, for injuries, damages and penalties for failing to maintain proper insurance.

83.    Accordingly, I believe that it is in the best interests of the Debtors' estates to continue to pay the amounts due under the Policies and the PFA regardless of whether a given payment became due prior to or after the Petition Date.

**M.    Application for an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and LBR 2002-1(f) ("Notice and Claims Agent Application")**

84.    Pursuant to the Notice and Claims Agent Application, the Debtors are seeking authority to retain Kurtzman Carson Consultants LLC ("KCC") as their Claims and Noticing Agent. The Debtors have evaluated several potential candidates to serve as their Claims and Noticing Agent. Following that review, and in consideration of the number of anticipated claimants and parties in interest, the nature of the Debtors' business, and the scope of tasks for which the Debtors will require the assistance of a Claims and Noticing Agent, the Debtors submit that the appointment of KCC as Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates.

85.    The Debtors estimate that there are hundreds of creditors holding claims against the Debtors' estates, including former employees and other parties-in-interest who require notice of various matters, and in particular the deadline for filing proofs of claim. Additionally, many of these parties may file proofs of claim.

86.    I believe that this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of the Cases and other developments in the Cases. Accordingly, I respectfully request that the Court authorize the Debtors to retain Kurtzman Carson Consultants LLC.

**N.    Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor ("Consolidated Matrix Motion")**

87.    Local Rule 2002-1(f)(v) requires each debtor, or its duly retained agent, in jointly administered cases to maintain a separate creditor mailing matrix. Local Rule 1001-1(c) permits modification of the Local Rules by the Court "in the interest of justice." The Debtors submit that permitting them to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.

88.    Given the number of creditors to be noticed in these cases, I respectfully request that the Court authorize the Debtors to submit and maintain a single consolidated list of creditors in lieu of filing a separate creditor matrix for each Debtor.

**O.    Motion of the Debtors for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only ("Joint Administration Motion")**

33

89.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of these cases, for procedural purposes only.  I believe that many of the motions, applications, and other pleadings filed in these chapter 11 cases will relate to relief sought jointly by all of the Debtors.  I believe that joint administration of the Debtors' chapter 11 cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of seven independent chapter 11 cases.

90.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of October, 2015, at Wilmington, Delaware.

David M. Baker

**Exhibit A**
**Corporate Organizational Chart**

# Corporate Organization Chart

