IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALIBU LIGHTING CORPORATION, et al.,[1] | ) | Case No. 15-12080 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**MOTION OF DEBTOR NATIONAL CONSUMER OUTDOORS
CORPORATION F/K/A DALLAS MANUFACTURING COMPANY, INC.
FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POST-
PETITION FINANCING AND USE OF CASH COLLATERAL,
(B) GRANTING 363(c) AND 364(d) LIENS, A SUPERPRIORITY
ADMINISTRATIVE CLAIM, AND ADEQUATE PROTECTION, (C) APPROVING
AGREEMENTS WITH COMERICA BANK, AND (D) SETTING A FINAL HEARING**

National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Company,

Inc., one of the above-captioned debtors and debtors in possession herein (the "Debtor" or

"NCOC"), submits this motion (the "Motion") for entry of an interim order on an expedited

basis (the "Interim Order") substantially in the form attached hereto as **Exhibit 1**,[2] and

following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the

"Final Order" and, with the Interim Order, the "DIP Orders"), pursuant to sections 105, 361,

362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"),

Rule 4001 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and

Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of

---

[1] The Debtors, together with the last four digits of each Debtor's tax identification number, are: Malibu Lighting Corporation (8205); Outdoor Direct Corporation f/k/a The Brinkmann Corporation (9246); National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Company, Inc. (1153); Q-Beam Corporation (1560); Smoke 'N Pit Corporation (9951); Treasure Sensor Corporation (9938); and Stubbs Collections, Inc. (6615). The location of the Debtors' headquarters and service address is 4215 McEwen Road, Dallas, TX 75244.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order or the DIP Loan Note, as applicable.

Delaware (the "Local Rules"), (a) authorizing the Debtor to obtain post-petition loans, advances, and other credit accommodations (the "DIP Facility") from Comerica Bank (the "Lender" or "Comerica"), on a roll-up basis, and to use Cash Collateral (as defined below), pursuant to which the Lender will be granted, subject to the Carve-Out (as defined below), (i) a superpriority administrative claim pursuant to 11 U.S.C. § 364(c)(1); and (ii) first priority security interests in and liens upon substantially all property of the Debtor's estate pursuant to 11 U.S.C. §§ 364(c)(2) and 364(d); (b) approval of the terms and conditions of the *Senior Secured Revolving Note* by and between the Lender and the Debtor dated October 7, 2015 (the "DIP Loan Note") in the form attached hereto as **Exhibit 2** and the *Senior Secured, Superpriority Debtor-in-Possession Credit Agreement* by and between the Lender and the Debtor dated October 7, 2015 (the "DIP Financing Agreement") in the form attached hereto as **Exhibit 3**; (c) modification of the automatic stay solely to the extent necessary to enter into the proposed financing and effectuate the terms thereof; and (d) granting related relief. In support of this Motion, the Debtor relies on the *Declaration of David M. Baker in Support of First Day Motions* (the "First Day Declaration") filed concurrently herewith and fully incorporated herein by reference. The Debtor further represents as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Local

Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the

extent that it is later determined that the Court, absent consent of the parties, cannot enter final

orders or judgments in connection herewith consistent with Article III of the United States

Constitution.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are sections 105, 361,

362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and

Local Rules 2002-1(b) and 4001-2.

### Overview

4.    By this Motion, the Debtor seeks entry of the Interim Order, which:

    a.    authorizes the Debtor to obtain senior secured post-petition financing on an interim basis pursuant to the terms and agreements set forth in the proposed Interim Order, the DIP Loan Note, and the DIP Financing Agreement;

    b.    grants to the Lender senior liens and superpriority administrative claim status pursuant to sections 364(c)-(d) and 507(b) of the Bankruptcy Code in accordance with the terms of the Interim Order;

    c.    authorizes the Debtor to use cash collateral whenever or wherever acquired, and the proceeds of all collateral pledged to any prepetition secured party, as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth in the Interim Order;

    d.    grants adequate protection to the Lender and other prepetition secured parties in accordance with the terms set forth in the Interim Order;

    e.    modifies the automatic stay to the extent set forth in the Interim Order and waives the fourteen (14)-day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h), thereby providing for the immediate effectiveness of the Interim Order; and

    f.    sets a Final Hearing for entry of an order authorizing the DIP Facility and use of cash collateral on a final basis.

3

## Concise Statement of Relief Requested

5. In accordance with Bankruptcy Rules 4001(b), (c), and (d) and Local Rule 4001-(2), below is a summary of the terms of the proposed DIP Facility:[3]

| | |
|---|---|
| **Borrower:** | National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Company, Inc. |
| **Guarantor:** | None. |
| **Agent:** | None. |
| **Postpetition Lender:** | Comerica Bank |
| **Entities with Interests in Cash Collateral:** | Comerica Bank in connection with the Lender Pre-Petition Debt (as defined below). Bank of America, N.A., as lender and agent (the "Guaranty Agent"), under that certain *Amended and Restated Credit Agreement*, dated as of March 9, 2012, as amended (the "BofA Credit Agreement"). Debtor Outdoor Direct Corporation f/k/a The Brinkmann Corporation is the borrower under the BofA Credit Agreement. Debtor NCOC guaranteed the obligations under the BofA Credit Agreement and pledged substantially all of its assets in order to secure such obligations, which are junior to the Lender Pre-Petition Debt. Comerica is also a participating lender under the BofA Credit Agreement. |
| **Type and Amount of DIP Facility:** | A senior debtor-in-possession loan facility extended by the Lender pursuant to the terms of the Interim Order and the terms and conditions set forth in the DIP Loan Note and DIP Financing Agreement in the principal amount of up to $21,500,000, of which $11,000,000 would be available on an interim basis. |
| **Availability:** | Advances under the DIP Loan Note shall be made pursuant to the following formula after including all indebtedness owed by the Debtor to the Lender as of the Petition Date:<br>• 85% of eligible accounts receivable<br>• 100% of accounts receivable backed by letters of credit from reputable financial institutions<br>• 60% of eligible inventory<br>• $5,000,000.00 over formula<br>(Interim Order ¶ 2). |
| **Pre-Petition Obligations/Roll-Up:** | Postpetition receipts shall be used to satisfy the Lender Pre-Petition Debt until it is paid in full.  (Interim Order ¶ 7). |

---

[3] The summary of the terms and conditions of the DIP Facility as described in this Motion are intended solely for informational purposes and are qualified in their entirety by the DIP Loan Note and the DIP Financing Agreement. In the event there is any conflict between this Motion and the DIP Loan Note or the DIP Financing Agreement, the DIP Loan Note and the DIP Financing Agreement will control in all respects.

| | |
|---|---|
| **Purpose / Use of Proceeds:** | The Debtor is authorized to use proceeds of the loans and advances made, and other credit accommodations provided, by the Lender to the Debtor, and to use Cash Collateral, for the payment of its actual and necessary post-petition obligations including, without limitation, actual and necessary general operating and working capital expenses incurred in the ordinary course of the Debtor's business and in accordance with the terms and conditions of the DIP Loan Note, the DIP Financing Agreement and the budget attached to the Interim Order as Exhibit A (the "Budget"), subject to the Permitted Variances (as defined below). (Interim Order ¶ 3). |
| **Limitation on Uses** | No funds shall be paid or made available, whether from the DIP Facility or the Carve-Out, for any fees, disbursements or expenses of any party, including the Debtor or any official committee in this case (the "Committee"), or any professional employed by any party, in connection with (i) the initiation or prosecution of (but excluding any investigation into) any claims, causes of action, adversary proceedings, or other litigation against the Lender or the Guaranty Agent (directly or indirectly), including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Lender Pre-Petition Liens, the Lender Pre-Petition Debt, the DIP Facility Obligations, the DIP Facility Superpriority Claim, the DIP Facility Liens, the Guaranty Indebtedness, or the Guaranty Agent's security interests in the Guaranty Collateral; provided, however, that the Committee shall be permitted to use such funds in an amount not to exceed $20,000.00 to investigate the factual and legal matters relevant to the Debtor's admissions and releases contained in paragraphs H-O of the Interim Order, and (ii) after a Default or an Event of Default, asserting any claims or causes of action against the Lender or the Guaranty Agent, including, without limitation, claims or actions to hinder or delay the Lender's assertion, enforcement or realization on the Collateral in accordance with the Lender DIP Loan Documents or the Interim Order. (Interim Order ¶ 5). |
| **Budget and Variances:** | The Budget may be modified or amended with the written approval of the Lender. The Budget includes specified amounts to fund an escrow to pay the administrative costs associated with the case, including, without limitation, to pay the budgeted fees of the Debtor's attorneys, accountants, and other professionals employed by the Debtor in this case and, if one is formed, to pay the budgeted fees of the Committee's professionals. In addition, the Debtor is authorized to use the proceeds of the loans and advances made, and other financial accommodations provided by the Lender to the Debtor, and to use Cash Collateral, to pay the fees and expenses of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6). The "Permitted Variances" are defined as the aggregate of the Debtor's actual cash disbursements (excluding interest and professional fees) during any consecutive four-week period that is less than or equal to 110% of the Debtor's budgeted cash disbursements on a line item basis (excluding interest and professional fees) during the same four-week period as set forth in the Budget. (Interim Order ¶ 3). |
| **DIP Collateral, Priority and Super-Priority Claim:** | Effective on and after the date of the Interim Order, to secure the prompt payment and performance of any and all post-petition obligations, liabilities and indebtedness (the "DIP Facility Obligations") of the Debtor to the Lender of whatever kind or nature or description arising under the DIP Loan Note and DIP Financing Agreement and any related post-petition documents and |

5

|  | instruments (collectively, the "<u>Lender DIP Loan Documents</u>"), Lender shall have and is granted: (y) a superpriority administrative claim pursuant to 11 U.S.C. § 364(c)(1) (the "<u>DIP Facility Superpriority Claim</u>"); and (z) valid and perfected security interests and liens, senior to all other creditors of the Debtor's estate, in and upon, excluding Permitted Encumbrances (as defined in the Lender Pre-Petition Loan Documents), all now existing and hereafter acquired personal and real property and fixtures of the Debtor and its bankruptcy estate, of whatever kind or nature, whether acquired prior to or subsequent to filing the Petition Date (collectively, the "<u>Post-Petition Collateral</u>" and together with the Pre-Petition Collateral, the "<u>Collateral</u>"), pursuant to 11 U.S.C. §§ 364(c)(2) and 364(d); (clause (z) is referred to as the "<u>DIP Facility Liens</u>"); provided, however, that the DIP Facility Superpriority Claim and the DIP Facility Liens shall be subject to the payment of the Carve-Out and shall not include any claims or causes of action arising under chapter 5 of the Bankruptcy Code or applicable state fraudulent transfer law and any proceeds thereof (together, "<u>Avoidance Actions</u>") until the entry of the Final Order.  For the avoidance of doubt, in the event of the occurrence of an event of default or similar event under the DIP Loan Note or DIP Financing Agreement (an "<u>Event of Default</u>"), or an event that would constitute an Event of Default with the giving of notice or lapse of time or both (a "<u>Default</u>"), the DIP Facility Superpriority Claim and the DIP Facility Liens shall be subject to the payment of the Carve-Out. (Interim Order ¶ 4). |
|---|---|
| **Fees and Expenses:** | The Debtor shall reimburse the Lender for its reasonable costs, fees (including reasonable attorneys' fees), charges, and expenses incurred in connection with the case whether incurred pre-petition or post-petition.  In addition, a DIP loan fee in the amount of $100,000 shall be payable to the Lender upon entry of the Interim Order.  (Interim Order ¶¶ 9 & DIP Financing Agreement at § 2.3). |
| **Interest Rate:** | Prime rate plus 3.00%.  The interest rate is assumed to be 6.25% pursuant to the Budget. |
| **Payment Terms/ Roll-Up** | All proceeds of the Lender's pre-petition collateral and post-petition collateral, including without limitation ordinary receipts from the operation of the Debtor's business, shall be applied first to the indebtedness owed by the Debtor to the Lender as of the Petition Date under that certain Amended and Restated Credit Agreement dated as of June 30, 2013, as amended (the "<u>Lender Pre-Petition Debt</u>").  After payment in full of the Lender Pre-Petition Debt, the remaining proceeds of the Lender's Collateral, including without limitation ordinary receipts from the operation of the Debtor's business, shall next be applied to the DIP Facility Obligations until they are paid in full.  The Debtor may re-borrow under the DIP facility to the extent of any repayments, subject to the terms of the DIP Loan Note and DIP Financing Agreement.  (Interim Order ¶ 7). |
| **Termination Date:** | The termination date ("<u>Commitment Termination Date</u>") shall be the earlier of: (a) any Event of Default, (b) the date that a Chapter 11 plan of the Debtor becomes effective, (c) the date of dismissal of the Chapter 11 case or conversion of the Chapter 11 case to a case under Chapter 7, (d) the appointment in the case of a Chapter 11 trustee or an examiner with expanded powers, (e) the entry of any order granting relief under section 506(c) of the Bankruptcy Code with respect to any of the Collateral, (f) the filing by the Debtor, without the Lender's prior written consent, of any motion to obtain |

6

|  | financing under section 364 of the Bankruptcy Code from any other person or entity other than the Lender, or otherwise to grant a lien or security interest on any of the Collateral in favor of any person or entity other than the Lender, (g) the Debtor's failure to comply with any provision of the Interim Order, (h) the closing and funding of a sale of all or substantially all of the Debtor's assets, or (i) December 31, 2015; provided, however, that if the Lender has given its express prior written consent to a different date (no such consent will be implied from any other action, inaction or acquiescence by the Lender) then that different date shall apply; and provided further that the Lender shall be required to provide written notice to the Debtor of the occurrence of item (g) above and the Debtor shall have five (5) business days to cure any such default. (Interim Order ¶ 17). |
|---|---|
| **Adequate Protection:** | The Lender is granted the following forms of adequate protection for the Lender's Pre-Petition Debt and the Lender Pre-Petition Liens, to the extent of any diminution in the value of the Lender's interests in the Lender Pre-Petition Liens from and after the Petition Date (the "<u>Lender Adequate Protection</u>"): (i) replacement liens and security interests on the Collateral, and the proceeds, income and profits and offspring of the Collateral; (ii) super-priority claims pursuant to 11 U.S.C. § 507(b); (iii) monthly payments of interest on the Lender Pre-Petition Debt in the amounts set forth in the Budget, and (iii) payment of all of Lender's pre-petition and post-petition reasonable costs, fees (including reasonable attorneys' fees), charges and expenses incurred in connection with this case. |
|  | The Guaranty Agent is granted the following forms of adequate protection of its interests in the Guaranty Collateral, to the extent of any diminution in the value of the Guaranty Agent's interests in the Guaranty Collateral from and after the Petition Date (the "<u>Guaranty Agent Adequate Protection</u>"): (i) replacement liens and security interests on the Collateral, and the proceeds, income and profits and offspring of the Collateral junior to the Lender Adequate Protection; (ii) super-priority claims pursuant to 11 U.S.C. § 507(b) junior to the Lender Adequate Protection; (iii) the Debtor shall timely deposit all post-petition taxes (whether federal, state or local) with the appropriate taxing authorities and timely file appropriate tax returns; (iv) the Debtor shall timely pay all U.S. Trustee fees; (v) the Debtor shall pay all reasonable fees, costs and expenses for the professionals of the Guaranty Agent and the Guaranty Lenders incurred in connection with the Debtor's case (whether incurred before or after the Petition Date); and (vi) the Debtor shall maintain insurance with respect to all of the Collateral for all the purposes and in the amounts maintained by the Debtor in accordance with the requirements of the Guaranty Loan Documents, as is currently in place. The Guaranty Agent Adequate Protection shall secure the Guaranty Agent and the Guaranty Lenders against the subordination of the Guaranty Agent's liens on and security interests in the Guaranty Collateral to the DIP Facility Liens, the Debtor's use of Cash Collateral, and any other diminution in the value of the Guaranty Agent's interest in the Guaranty Collateral from and after the Petition Date. |
|  | The Lender Adequate Protection and the Guaranty Agent Adequate Protection granted herein (i) are subordinate only to the Carve-Out (as defined below), the DIP Facility Superiority Claim, the DIP Facility Liens, and any prior existing and validly perfected liens and security interests in the Debtor's assets, (ii) shall |

7

|  | attach in the same order of priority that existed with respect to the Lender Pre-Petition Debt and the Guaranty Indebtedness under applicable non-bankruptcy law as of the Petition Date, (iii) are automatically perfected, and (iv) until entry of the Final Order, exclude any Avoidance Actions.<br><br>(Interim Order ¶ 8). |
|---|---|
| **Carve-Out:** | The DIP Facility Superpriority Claim, the DIP Facility Liens, the Lender Pre-Petition Debt, the DIP Facility Obligations, the Collateral, the Guaranty Indebtedness, the Guaranty Collateral, the Lender Adequate Protection, and the Guaranty Agent Adequate Protection shall be subject in all cases to payment of the following expenses (the "Carve-Out"):<br><br>(i) unpaid post-petition fees and expenses of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930;<br><br>(ii) accrued, but unpaid post-petition obligations of the Debtor up to the amounts set forth in the Budget (prorated on a daily basis) through the date of the Default Notice (as defined in paragraph 13 of the Interim Order), plus any accrued but unpaid prepetition paid time off owed to the Debtor's employees as of such date;<br><br>(iii) the Debtor's obligation, if any, to pay the Break-Up Fee and Expense Reimbursement (as such terms are defined in the *Asset Purchase Agreement* dated October 8, 2015, by and between the Debtor, as seller, and DMC Acquisition Holdings, LLC, as purchaser), which obligation is subject to approval of this Court and, once approved, shall be *pari passu* with the payment of estate professional fees as contemplated by paragraph 23(a)(iv) and (v) of the Interim Order;<br><br>(iv) unpaid post-petition fees and expenses of professionals of the Debtor and professionals of any Committee, which are retained by an order of the Court pursuant to sections 327, 328, 363 or 1103(a) of the Bankruptcy Code (the "Professionals"), but only to the extent such fees and expenses are (1) reflected in the budget, (2) incurred prior to the giving of the Default Notice by the Lender, (3) allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, and (4) not otherwise paid from retainers or the Expense Reserve Account (as defined below); and<br><br>(v) post-petition fees and expenses of the Professionals incurred after service of the Default Notice in an aggregate amount not to exceed $100,000.00, to the extent such fees and expenses are (i) allowed by the Bankruptcy Court under sections 330, 331, or 363 of the Bankruptcy Code, and (ii) not otherwise paid from retainers or the Expense Reserve Account.<br><br>Following entry of the Interim Order, so long as the Debtor is entitled to make draws under the DIP facility and no Event of Default or Commitment Termination Date shall have occurred, the Debtor shall be authorized to transfer funds to the Pachulski Stang Ziehl & Jones LLP Client Trust Account (the "Expense Reserve Account") on a weekly basis, the amounts that the Professionals may be paid pursuant to the Budget for such week. Such funds shall be held for the benefit of the Professionals, to be applied to the fees and expenses of such Professionals that are approved for payment pursuant to one or more orders of this Court. Any fees and expenses payable to Professionals shall be paid first out of the Expense Reserve Account, and all amounts |

8

|  | deposited in the Expense Reserve Account shall reduce, on a dollar-for-dollar basis, the Carve-Out. Any excess amounts in the Expense Reserve Account after payment of Professional Fees, and the obligations, if any, owed to the purchaser under paragraph 23(a)(iii) of the Interim Order, shall be remitted to the Lender. |
|  | (Interim Order ¶ 23). |
| **Covenants:** | Standard and customary affirmative and negative covenants for transactions of this sort are set forth in Articles 4 and 5 of the DIP Financing Agreement. |
| **Events of Default:** | As specified in the DIP Credit Facility Documents, including, without limitation, the following: (a) non-payment of any principal, interest or other sums due upon the Indebtedness at such time the same becomes due or, if applicable, upon expiration of the grace period, if any; (b) default in the observance or performance of any of the other conditions, covenants or agreements of any Loan Party set forth in the DIP Loan Agreement or any other Loan Document; (c) any representation or warranty made by any Loan Party in any Loan Document shall be untrue or incorrect in any material respect; (d) any default or event of default, as the case may be, shall occur under any other Loan Document and shall continue beyond the applicable grace period, if any; and (e) any change in the management, ownership or control of Borrower, whether by reason of incapacity, death, resignation, termination or otherwise which, in Bank's sole judgment, could become a Material Adverse Effect. (DIP Loan Agreement Article 6). |
| **Representations and Warranties:** | Standard and customary representations and warranties of the Debtor for transactions of this sort are set forth in Article 3 of the DIP Loan Agreement. |
| **Remedies:** | Following the Commitment Termination Date, and upon five (5) business days' written notice (which may be delivered by electronic mail) to the Debtor, its counsel, the United States Trustee, and counsel for the Committee, unless the Debtor obtains an order from the Court maintaining the automatic stay in effect within such five (5) business day notice period, the automatic stay of section 362(a) of the Bankruptcy Code shall be deemed terminated (and the fourteen (14) day stay provided by Federal Rule of Bankruptcy Procedure 4001(a)(3) shall be deemed waived) without the necessity of any further action by the Lender or any further authorization by this Court in order to permit the Lender to exercise all rights and remedies provided for in the Interim Order, the DIP Loan Documents, the Lender Pre-Petition Loan Documents, and applicable law, including but not limited to the Lender's right to apply the Cash Collateral and any other proceeds of the Collateral first to the Lender Pre-Petition Debt (in accordance with the terms of the Lender Pre-Petition Loan Documents) and next to the DIP Facility Obligation (in accordance with the Lender DIP Loan Documents) and applicable law, subject to amounts eligible to be paid from the Carve-Out that are in excess of any pre-petition retainers or trust account funds or the Expense Reserve Account otherwise available to pay such eligible amounts. (Interim Order ¶ 18). |
| **Validity and Perfection of Lender's Prepetition Liens** | The Debtor stipulates in the DIP Orders that (i) Comerica's liens securing the Lender Pre-Petition Debt and the Guaranty Agent's liens securing the Guaranty Indebtedness are valid, perfected, and encumber substantially all assets of the Debtor, and (ii) the Debtor possesses no claims, offsets or any other type cause |

9

| | |
|---|---|
| **and Claims:** | of action against Comerica or the Guaranty Agent which would impair Comerica's or the Guaranty Agent's liens against Debtor's assets, or the Lender Pre-Petition Debt or the Guaranty Indebtedness. The Debtor's stipulations shall be binding upon all parties in interest unless (i) an adversary proceeding is filed (x) by any party-in-interest prior to the expiration of 75 days after the Petition Date or (y) by the creditors' committee, if formed, 60 days after its formation (the "Review Period") against Comerica or the Guaranty Agent challenging Comerica's or the Guaranty Agent's liens or otherwise asserting estate claims against Comerica or the Guaranty Agent, and (ii) a final, non-appealable judgment is entered against Comerica or the Guaranty Agent in such adversary proceeding; provided, however, any party-in-interest that fails to file an adversary proceeding within the Review Period shall be forever barred from asserting any claims against Comerica or the Guaranty Agent on behalf of the Debtor's estate, or challenging in any manner Comerica's or the Guaranty Agent's liens and claims. (Interim Order ¶¶ H-O, 21 ). |
| **Miscellaneous** | The Debtor and the Lender shall in good faith negotiate the terms of a wind-down budget for the period following the going concern disposition of the Debtor's operating assets. Notwithstanding anything to the contrary herein or in the Budget, to the extent that Piper Jaffray & Co., as investment banker, becomes entitled to a sale fee under its Court-approved engagement agreement with the Debtor in connection with a sale of the Debtor's assets, then such fee shall be payable at closing of the sale, subject to allowance of such fee by this Court, notwithstanding any liens, claims, or interests of the Lender or the Guaranty Agent. |

### Disclosures

6.      Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or to obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions. In addition to the descriptions above, set forth below are the disclosures required in accordance with such rules:

a.      Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing. **The proposed Interim Order (i) grants adequate protection liens in favor of Comerica on account of the Lender Pre-Petition Debt and the Guaranty Agent on account of the Guaranty Indebtedness, and (ii) provides for a "roll-up" of the Lender Pre-Petition Debt owed to Comerica from postpetition cash receipts. Interim Order at ¶¶ 7-8).**

DOCS_DE:202331.1 10821/001

b.   Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters. **The proposed Interim Order (i) contains stipulations as to the validity and priority of the prepetition liens and claim of Comerica and the Guaranty Agent, and (ii) releases any claims by the Debtor against the lenders. However, such provisions are subject to challenge (a) by the Committee within sixty (60) calendar days from the date its appointment by the U.S. Trustee, and (b) by any party in interest with requisite standing within seventy-five (75) calendar days from the Petition Date, whichever date is earlier. Interim Order at ¶¶ H through O & 21.**

c.   Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code. **The proposed Interim Order provides for a waiver of the Debtor's rights under section 506(c) of the Bankruptcy Code only upon entry of the Final Order. Interim Order ¶ 25.**

d.   Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code. **The Interim Order does not provide for any grant of liens against Avoidance Actions until entry of the Final Order. Interim Order ¶ 4.**

e.   Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). **As noted above, the Interim Order contemplates a "roll-up" of the Lender Pre-Petition Debt owed to Comerica from postpetition cash receipts. Interim Order at ¶ 7.**

f.   Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee Carveout. **The proposed Interim Order does not provide for disparate treatment for the professionals retained by a Committee from those professionals retained by the Debtor, except that the Budget projects Debtor professional fees to exceed Committee professional fees. Interim Order ¶ 23; Budget attached to Interim Order.**

11

g.    Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder. **The proposed Interim Order provides for the priming of the prepetition secured liens with respect to the Lender Pre-Petition Debt and the Guaranty Indebtedness. However, such priming is consensual. Interim Order ¶¶ 4 & 8.**

h.    Local Rule 4001-2(a)(i)(H) requires the disclosure of provisions that affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code. **The proposed Interim Order contains no such provisions.**

i.    Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. **The proposed Interim Order describes the provision of adequate protection on account of the Lender Pre-Petition Debt and the Guaranty Indebtedness. Interim Order ¶ 8.**

j.    Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. **The proposed Interim Order describes the modification of the automatic stay (a) upon an event of default, (b) the Commitment Termination Date, and (c) to the extent necessary to implement the Interim Order and DIP Facility. Interim Order ¶¶ 13, 18, & 26.**

k.    Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate. **The proposed Interim Order includes provisions that provide for the automatic perfection and validity of postpetition liens in favor of the Lender without the necessity of any further filing or recording under the laws of any jurisdiction. Interim Order ¶ 10.**

### Background

7.    On the date hereof (the "Petition Date"), the Debtor, along with its affiliates, filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its properties as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or creditors' committee has been appointed in the Debtor's chapter 11 case.

8.    As of the Petition Date, the Debtor entered into an asset purchase agreement with an affiliate of Summit Investment Management LLC for the sale of substantially all of its assets for $36,850,000 in cash, plus the assumption of certain liabilities set forth in the agreement. The sale is subject to higher and better bids at auction and the Debtor expects to continue its current operations in the ordinary course pending the outcome of its sale process.

9.    The Debtor was established in 1988 and is headquartered in Dallas, Texas. NCOC is a leading manufacturer and supplier of both branded and private label pet bedding and pet accessory products.  NCOC manufactures beds, accessories, and deodorizers for dogs and beds, scratching posts, and toys for cats.  In addition, NCOC manufactures boat covers.

10.    NCOC maintains fulfillment and warehouse facilities totaling over 800,000 square feet of warehouse space in Athens, Texas that it leases from non-debtor J. Baxter Brinkman International.  NCOC also has product development and design operations, as well as manufacturing and quality control operations, in Shanghai, China.  NCOC designs, manufactures, and markets its products through national big box retailers and national and regional discount stores, wholesale clubs, sporting goods stores, drug stores, grocery stores, catalog showrooms, marine outlets, pet distributors, mail-order catalogue, houses and online retailers.  A number of its products are sourced and manufactured, in whole or in part, overseas, primarily through a representative office of NCOC's foreign affiliates in Shanghai, China, with some manufacturing and assembly performed domestically and with warehousing, fulfillment, and distribution operations occurring at its facilities in Athens, Texas.

13

11.     NCOC is a profitable company.  For the fiscal year ending January 31, 2105, NCOC generated $117.8 million in gross sales and positive EBIDTA of $9.6 million on a stand-alone basis.  NCOC reported net income of $5.4 million for the fiscal year 2014.

### Prepetition Capital Structure and Indebtedness

12.     NCOC is a party to that certain *Amended and Restated Credit Agreement*, dated as of June 30, 2013, as amended, between NCOC and Comerica Bank (the "NCOC Comerica Credit Agreement").  NCOC is the only obligor under the NCOC Comerica Credit Agreement, which is secured by substantially all of NCOC's assets.  As of October 5, 2015, Comerica is owed approximately $25,801,582.89 in principal obligations, plus accrued interest and fees, under the NCOC Comerica Credit Agreement (also referenced herein as the "Lender Pre-Petition Debt").

13.     NCOC is also a guarantor of the obligations under that certain *Amended and Restated Credit Agreement*, dated as of March 9, 2012, as amended (the "BofA Credit Agreement"), by and between Debtor Outdoor Direct Corporation and Bank of America, N.A., as administrative agent (the "Guaranty Agent").[4]  The Guaranty Agent holds security interests and liens in substantially all of the Debtor's assets (the "Guaranty Collateral").  The Guaranty Collateral secures all indebtedness owed by the Debtor under the Guaranty Loan Documents (as defined in the Interim Order).  Such indebtedness is referred to as the "Guaranty Indebtedness." The Guaranty Indebtedness, as of October 7, 2015, is not less than $44,413,950.20, consisting of

---

[4] Pursuant to an intercreditor agreement, NCOC's guaranty obligations under the BofA Credit Agreement are junior to NCOC's obligations to Comerica Bank under the NCOC Comerica Credit Agreement.

principal in the amount of $44,060,185.37 and accrued and unpaid interest in the amount of

$353,764.83.

### **Need for the DIP Facility and Continued Use of Cash Collateral**

14.     The Debtor has an urgent and immediate need to obtain postpetition

financing.  The Debtor does not have sufficient funds on hand or generated from its business to

fund its operations, particularly the need to purchase new inventory.  Without the proposed

postpetition financing and the use of cash collateral as set forth in the Interim Order, the Debtor

would not be able to maintain its going concern value or to effectuate an orderly sale process that

would maximize value for all constituents.

15.     Specifically, without the proposed credit facility and access to cash

collateral, the Debtor will not have the liquidity to operate its business, purchase new inventory,

fund its ordinary course expenditures, including paying its employees and the expenses

necessary to administer the chapter 11 case, pending the contemplated sale of the Debtor's

assets.  Absent adequate funding, the Debtor would be required to cease operations and liquidate

on a piecemeal basis, causing irreparable harm to the Debtor and its estate.  Accordingly, the

Debtor has an urgent and immediate need for the DIP Facility and entry of the Interim Order.

16.     The Debtor sought and was unable to obtain financing from other sources

on terms preferable to the proposed DIP Facility.  The Debtor does not believe that it is able to

obtain postpetition financing or other financing accommodations from any prospective lender or

group of lenders on more favorable terms and conditions than those described herein.  The DIP

Facility was negotiated in good faith and at arm's length, and extensively and diligently

considered by the Debtor.  The Debtor believes that the proposed terms of the DIP Facility are

fair and reasonable in light of current market conditions and is in the best interests of the

Debtor's estate.  Moreover, by entering into the DIP Facility with its prepetition secured lender,

Comerica, and having been able to negotiate adequate protection arrangements with the

Guaranty Agent, the Debtor has eliminated any unnecessary priming fight with the Debtor's

prepetition secured lenders.

      17.    For the foregoing reasons, the Debtor has determined, in the exercise of its

sound business judgment, that the Debtor requires financing under the terms of the DIP facility

and the use of cash collateral pursuant to the terms and conditions of the Interim Order, and

hereby requests approval of the DIP Loan Note and the DIP Financing Agreement.

**Basis For Relief**

**A.**    **The Debtor Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code.**

      18.    Section 364(c) of the Bankruptcy Code requires a finding, made after

notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot

"obtain unsecured credit allowable under section, 503(b)(l) of [the Bankruptcy Code] as an

administrative expense." 11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy

Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides

that the Court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt
> secured by a senior or equal lien on property of the estate
> that is subject to a lien only if --
>
> > (A)    the [debtor] is unable to obtain credit
> > otherwise; and

16

> (B)     there is adequate protection of the interest of
> the holder of the lien on the property of the estate
> on which such senior or equal lien is proposed to be
> granted.

11 U.S.C. § 364(d)(l).

19.     In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether:

> a.     unencumbered credit or alternative financing without superpriority
> status is available to the debtor;
>
> b.     the credit transactions are necessary to preserve assets of the estate;
>
> c.     the terms of the credit agreement are fair, reasonable, and
> adequate;
>
> d.     the proposed financing agreement was negotiated in good faith and
> at arm's-length and entry thereto is an exercise of sound and reasonable business
> judgment and in the best interest of the debtors' estate and its creditors; and
>
> e.     the proposed financing agreement adequately protects prepetition
> secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr.

E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003)

(applying all factors in making a determination under section 364(d)).

20.     For the reasons discussed herein, the Debtor satisfies the standards

required to obtain postpetition financing on a secured superpriority and priming lien basis under

sections 364(c) and (d) of the Bankruptcy Code.

**B.**    **The Debtor Was Unable to Obtain Financing on More Favorable Terms.**

21.    The Debtor is already substantially leveraged and faces material liquidity restraints, particularly given the Debtor's present need to purchase inventory. The Debtor was forced to file this chapter 11 case to preserve the value of its assets and effectuate a going concern sale process. The Debtor is not able to obtain alternative financing from outside parties and the current proposal was on the terms that were most beneficial to the estate. Indeed, without the proposed DIP Facility, the Debtor would be assured of a piecemeal liquidation under chapter 7 of the Bankruptcy Code, rather than an orderly, going concern sale that will result in substantially higher proceeds.

22.    The Debtor respectfully submits that its efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.**    **The Proposed Financing is Necessary to Preserve the Assets of the Debtor's Estate.**

23.    The Debtor requires the proposed financing to provide the Debtor with the necessary capital with which to operate its business, including funding the Debtor's obligations

18

to employees, and to preserve its business as a going concern for the benefit of its estate and creditors.

24.    The Debtor does not have sufficient sources of working capital, financing or cash collateral to carry on the operation of its business without additional financing. The Debtor's ability to maintain its business is dependent on its ability to continue to operate, and the Debtor cannot operate unless it can fund payments for postpetition inventory, services, and other operating expenses. The proposed DIP Facility thus is essential to the Debtor's continued viability and the value of its business as a going concern and will provide the Debtor with the opportunity to preserve its business so that the contemplated going concern sale process can be effectuated.

25.    The alternative in this case is "to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of *all* classes of creditors and other constituencies involved in this case." *In re Dynaco Corp.,* 162 B.R. 389, 396 (Bankr. D.N.H. 1993). Because this result would be at fundamental odds to the rehabilitative purposes of chapter 11, approval of the Motion is warranted. *Id.* at 394 (noting that "it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible") (*quoting In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

26.    As debtor in possession, the Debtor has a fiduciary duty to protect and maximize its estate assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.),* 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtor requires postpetition financing and the use of cash

19

collateral under the terms of the proposed DIP Facility to continue its operations, preserve its

going concern value, and conduct an orderly chapter 11 sale process.

**D.**     **The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.**

27.     In considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003);

*see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re*

*Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter

into hard bargains to acquire funds).

28.     The terms of the proposed DIP Orders, DIP Loan Note, and DIP Financing

Agreement were negotiated in good faith and at arm's-length between the Debtor and the

Lender, resulting in an overall arrangement designed to permit the Debtor to maximize the value

of its assets through an orderly sale process. The proposed terms are fair, reasonable and

appropriate under the circumstances, and should be approved. *See, e.g., Bray v. Shenandoah*

*Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that

section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender,

particularly when "time is of the essence to preserve a vulnerable seasonal enterprise"); *In re*

*Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition

financing to preserve value of aircraft leaseholds where to hold otherwise would result in the

elimination of their value and the "immediate collapse of the Debtor as a going concern").

**E.**     **Entry Into the Proposed Financing Reflects the Debtor's Sound Business Judgment.**

29.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

30.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

31.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see*

21

*also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

32.    Here, the Debtor's sound business judgment clearly supports entry into the DIP Facility in order to gain access to needed funding and thereby maximize value for all constituents.

**F.    Comerica, as the Lender, Should Be Deemed a Good Faith Lender**

33.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

34.    The DIP Facility is the result of the Debtor's reasonable and informed determination that the Lender offered the most favorable terms on which to obtain needed postpetition financing, and of arm's length, good-faith negotiations between the Debtor and the

22

Lender.  The terms and conditions of the DIP facility are reasonable and appropriate under the

circumstances, and the proceeds of the DIP facility will be used only for purposes that are

permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party

to the DIP facility other than as described herein.  Accordingly, the Court should find that the

Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and

is entitled to all of the protections afforded by that section.

**G.**　　**Section 363 of the Bankruptcy Code Authorizes the Debtor's Use of Cash Collateral**

35.　　Section 363(c)(2) of the Bankruptcy Code provides that a debtor in

possession may not use cash collateral unless (A) each entity that has an interest in such cash

collateral provides consent, or (B) the court approves the use of cash collateral after notice and a

hearing.  *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on

request of an entity that has an interest in property used . . . or proposed to be used . . . by the

[debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to

provide adequate protection of such interest."  11 U.S.C. § 363(e).

36.　　Neither section 361 nor any other provision of the Bankruptcy Code

defines the nature and extent of the "interest in property" of which a secured creditor is entitled

to adequate protection under section 361.  However, the statute plainly provides that a qualifying

interest demands protection only to the extent that the use of the creditor's collateral will result in

a decrease in "the value of such entity's interest in such property."  11 U.S.C. §§ 361, 363(e); *see*

*also General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R.

987, 989-90 & n.4 (Bankr. D. Utah 1982).

23

37.    The phrase "value of such entity's interest," although not defined in the

Bankruptcy Code, was addressed by the Supreme Court in the landmark *Timbers* decision,

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108

S.Ct. 626 (1988).  For the meaning of "value of such entity's interest," the Supreme Court was

guided by section 506(a), which defines a creditor's allowed secured claim:

> The phrase 'value of such creditor's interest' in § 506(a)
> means 'the value of the collateral.'  H.R. Rep. No. 950-595,
> pp. 181, 356 (1977); *see also* S. Rep. No. 95-989, p. 68
> (1978), U.S. Code Cong. & Admin. News, 1978 pp. 5787,
> 5854, 6141, 6312.  *We think the phrase 'value of such
> entity's interest' in § 361(1) and (2), when applied to
> secured creditors, means the same.*

*Id.* at 630 (emphasis added).

38.    *Timbers* teaches that a secured creditor is entitled to "adequate protection"

only against diminution in the value of the collateral securing the creditor's allowed secured

claim.  Under *Timbers*, therefore, where the "value of the collateral" is not diminishing by its

use, sale, or lease, the creditor's interest is adequately protected.  This conclusion flows directly

from the equivalency of "value of such entity's interests" with "value of the collateral."

39.    Here, the interests of Comerica and the Guaranty Agent are adequately

protected under Section 363(c)(2)(B) for the following reasons.  First, the lenders consent to the

Debtor's use of cash collateral on the terms of the proposed DIP Orders.  Second, the Debtor

intends to preserve value by maintaining operations as a going concern.  Any potential going

concern sale that would maximize the value of the Debtor's assets will go by the wayside in the

event that the Debtor's operations were abruptly terminated.  Third, the prepetition secured

24

parties will be adequately protected through the grant of adequate protection under the DIP

Orders. Section 361 of the Bankruptcy Code authorizes a debtor to provide adequate protection

by granting replacement liens, making periodic cash payments, or granting such other relief "as

will result in the realization by such entity of the indubitable equivalent of such entity's interest

in such property," *See* 11 U.S.C. § 361.

40.     The Debtor believes that the proposed adequate protection described

herein is fair and reasonable and will compensate the prepetition secured parties for any possible

diminution in value of their respective prepetition liens in the Debtor's assets. Given the likely

significant value that the Debtor stands to lose in the event that it is denied access to continued

use of cash collateral, the proposed protections are wholly appropriate and justified.

**H.      The Automatic Stay Should Be Modified on a Limited Basis**

41.     The Debtor requests that the automatic stay imposed by section 362 be

modified to the extent necessary to implement and effectuate the terms and provisions of the

Interim Order and the other DIP Facility documents. Such stay modifications are commonplace

and standard features of debtor-in-possession financing arrangements and, in the Debtor's

business judgment, are reasonable and fair under the circumstances of this chapter 11 case. *See,*

*e.g., In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating

automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No.

11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to

effectuate the terms of the order*); In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del.

Feb. 16, 2010) (same).

25

**Interim Order and Final Hearing**

42.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

43.     The urgent need to preserve the Debtor's business, and avoid immediate and irreparable harm to the Debtor's estate, makes it imperative that the Debtor be authorized to obtain postpetition financing and use cash collateral as of the Petition Date, pending the Final Hearing, in order to continue its operations and administer the Debtor's chapter 11 case. Without the ability to obtain access to such funding, the Debtor would be unable to meet its postpetition obligations and would be unable to fund its operational needs, thus causing irreparable harm to the value of the Debtor's estate and ending the Debtor's efforts to preserve its business as a going concern.

44.     Accordingly, the Debtor respectfully requests that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

**Notice**

45.     Notice of this Motion will be provided to: (a) the United States Trustee, (b) all creditors known to Debtor who may have liens against the Debtor's assets, (c) the United States Internal Revenue Service, (d) the thirty-five (35) largest unsecured creditors of the Debtor

and its jointly administered affiliates, and (e) all other creditors and parties in interest requesting

notice under Bankruptcy Rule 2002(i) (together, the "Notice Parties").

### Notice with Respect to Final Hearing

46.    Pursuant to Bankruptcy Rule 4001, the Debtor requests that it be

authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with

the Interim Order, by hand or overnight mail or courier service (or for those set up to receive

electronic transmissions, by electronic transmission), upon the Notice Parties.  The Debtor

submits that such notice is sufficient and requests that this Court find that no further notice of the

Final Hearing and the Final Order is required.

### No Prior Request

47.    No prior motion for the relief requested herein has been made to this or

any other court.

WHEREFORE, based upon the foregoing, the Debtor requests entry of the

Interim Order and the Final Order under sections 105, 361, 362, 363, 364, and 507 of the

Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2, (i) authorizing the Debtor

to (a) obtain financing under the terms of the DIP Facility documents and use cash collateral

and (b) provide adequate protection to the prepetition secured parties; (ii) scheduling the

final hearing; and (iii) granting such other and further relief that may be just and

appropriate.

Dated:  October 8, 2015_        PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No.143717)
Maxim B. Litvak (CA Bar No. 215852)
Michael R. Seidl (DE Bar No. 3889)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone:  302/652-4100
Facsimile:  302/652-4400
E-mail:    jpomerantz@pszjlaw.com
          mlitvak@pszjlaw.com
          mseidl@pszjlaw.com

Proposed Counsel for the Debtors