IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MALIBU LIGHTING CORPORATION, et al.,[1] | ) | Case No. 15-12080 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**Objection Deadline: January 13, 2016, at 4:00 p.m. (Eastern time)**
**Hearing Date: January 20, 2016, at 3:00 p.m. (Eastern time)**

### MOTION OF DEBTORS OUTDOOR DIRECT CORPORATION F/K/A THE BRINKMANN CORPORATION AND MALIBU LIGHTING CORPORATION FOR ORDER: (A) APPROVING BIDDING PROCEDURES AND BIDDING PROTECTIONS FOR THE AUCTION OF DEBTORS' INVENTORY, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) SCHEDULING AN AUCTION AND SALE HEARING, AND (C) GRANTING RELATED RELIEF

Debtors Outdoor Direct Corporation f/k/a The Brinkmann Corporation ("ODC")

and Malibu Lighting Corporation ("MLC"), two of the above-captioned debtors and debtors in

possession herein (collectively, the "Debtors"), file this motion (this "Bidding Procedures

Motion") for the entry of an order:  (a) approving bidding procedures and bidding protections for

the sale of substantially all of the Debtors' inventory, including approval of a break-up fee and

expense reimbursement, as described further herein; (b) scheduling an auction and hearing to

consider the sale of the subject assets; and (c) granting related relief, including but not limited to

approving the form and manner of notices related to the foregoing.

Concurrently herewith, the Debtors are filing the *Motion of Debtors Outdoor*

*Direct Corporation f/k/a The Brinkmann Corporation and Malibu Lighting Corporation for*

---

[1]  The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Malibu Lighting Corporation (0556); Outdoor Direct Corporation f/k/a The Brinkmann Corporation (9246); National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Company, Inc. (1153); Q-Beam Corporation (1560); Smoke 'N Pit Corporation (9951); Treasure Sensor Corporation (9938); and Stubbs Collections, Inc. (6615).  The location of the Debtors' headquarters and service address is 4215 McEwen Road, Dallas, TX 75244.

*Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of the Debtors'*

*Inventory; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights,*

*Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f)*

*and 363(m); and (C) Granting Related Relief* (the "Sale Motion"), which seeks authorization of

the sale of the applicable assets to (i) Sears Holdings Management Corp., a Delaware corporation

(the "Stalking Horse" or the "Purchaser"), pursuant to that certain *Asset Purchase Agreement*

between the Debtors and the Stalking Horse dated as of December 30, 2015, a copy of which is

attached to the Sale Motion as Exhibit A (the "Agreement"),[2] or alternatively, (ii) the highest or

otherwise best bidder for such assets determined in accordance with the proposed bid procedures.

As discussed below and in the Sale Motion, the proposed sale is in the best interests of the

Debtors, their estates and creditors.

 In support of this Bidding Procedures Motion, the Debtors respectfully state as

follows:

### Jurisdiction and Venue

 1. The United States Bankruptcy Court for the District of Delaware (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28

U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

---

[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Agreement.

District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection

with this Motion to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III

of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 105, 363,

503, 507, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

## Background

4.     On October 8, 2015 (the "Petition Date"), the Debtors each filed with this

Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are

operating their businesses and managing their properties as debtors and debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     No request has been made for the appointment of a trustee or an examiner

in these cases.  As set forth in a notice dated October 20, 2015, an official committee of

unsecured creditors (the "Committee") was appointed by the Office of the United States Trustee.

6.     The factual background regarding the Debtors and their affiliates,

including their current and historical business operations and the events precipitating the chapter

11 filing, is set forth in detail in the *Declaration of David M. Baker in Support of First Day Motions* (the "<u>First Day Declaration</u>") filed on October 8, 2015, which declaration is incorporated herein by reference.

### Description of Debtors and the Assets to Be Sold

7.     As of the Petition Date, the Debtors and certain of their debtor affiliates and their affiliates had three primary lines of business.  As more fully explained below, ODC and MLC are currently winding down their operations and liquidating their remaining assets, while National Consumer Outdoors Corporation f/k/a Dallas Manufacturing Corporation ("NCOC"), a subsidiary wholly owned by ODC and also an affiliate debtor in the Debtors' jointly administered cases, recently sold substantially of its operating assets as a going concern pursuant to a sale approved by the Bankruptcy Court on November 19, 2015.

8.     ODC AND MLC are sister companies.  Debtor ODC was a manufacturer and supplier of a variety of consumer goods, including (a) outdoor cooking products, such as outdoor gas grills, charcoal grills, smokers and fryers, (b) hand held lighting products, such as flashlights and spotlights, (c) landscape lighting products, and (d) parts and accessories associated with the foregoing products.  ODC is currently winding down operations after its principal customer, The Home Depot, terminated its relationship with the company in June 2015. ODC leases three facilities located in Dallas, Texas (McEwen Road); Athens, Texas; and Shreveport, Louisiana.  ODC also owns facilities in Olive Branch, Mississippi; Dallas, Texas (Simonton Road); and Keithville, Louisiana.  Like MLC, ODC previously had product development, design, manufacturing, and quality control operations in China.  ODC's products

4

were primarily manufactured by third parties in China.  ODC also formerly manufactured outdoor cooking products at its facility in Shreveport, Louisiana.

9.      MLC was a manufacturer and supplier of outdoor and landscape lighting products, such as solar and low voltage lights and home security lights, including the parts and accessories associated with these products.  MLC is currently winding down operations after its principal customer, The Home Depot, terminated its relationship with the company in July 2015.  The majority of MLC's warehousing activities are at its facility in Kosciusko, Mississippi.  MLC also has minimal warehouse activities in Dallas, Texas.  Prior to the wind-down of its business, MLC had product development, design, manufacturing, and quality control operations in China.  MLC's products were also generally manufactured by third parties in China.

10.     Pursuant to the Sale Motion, the Debtors seek approval of the sale (the "Sale") of the Acquired Inventory of the Debtors (as defined in the Agreement, subject to the provisions of Section 1.1(b) of the Agreement).  Under the Agreement, the total consideration to be paid by Purchaser to the Debtors for the Acquired Inventory will be $1,792,000 in cash, subject to the adjustments set forth in Sections 1.1(b) and 2.4 of the Agreement, plus the assumption of certain limited liabilities as expressly set forth in Section 2.5 of the Agreement.

11.     In light of the significant marketing process already undertaken (as described below) and the additional efforts that will be made during the proposed sale process, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to either the Stalking Horse under the terms of the Agreement or, alternatively, to a higher and better bidder for the Acquired Inventory.  Further, the Debtors believe that the proposed

timetable for the sale is reasonable by minimizing exposure of the Debtors' business to the uncertainties associated with bankruptcy, while at the same time providing an adequate opportunity for competing bids to be solicited.  The Purchaser has also imposed certain deadlines on the Debtors under the Agreement in order to accomplish the sale, including deadlines of January 21, 2016, by which date the Procedures Order must be entered by the Bankruptcy Court, of February 11, 2016, by which date the Sale Order must be entered, and of February 29, 2016, by which date the Closing Date must occur.[3]  If any of these deadlines are not met, the Stalking Horse may terminate the Agreement pursuant to Section 11.4 of the Agreement.

## **Prior Marketing Process**

12.    Prepetition, the Debtors and their debtor affiliates (the "Companies") commenced the process of evaluating restructuring and sale options.  Ultimately in respect to NCOC, after a Court-approved overbidding, auction and sale process, substantially all of NCOC's operating assets were sold to a third party buyer Central Garden & Pet Company pursuant to an order entered by the Bankruptcy Court on November 19, 2015.  This sale transaction was consummated on December 1, 2015.

13.    Unlike NCOC, which was sold as a going concern, the Debtors are in the process of winding down their respective businesses – a process that began prepetition.  Given The Home Depot's prepetition termination of its respective relationships with MLC and ODC, the Debtors focused on the expedited liquidation sales, in light of the seasonality of much of the

---

[3] Relatedly, the Purchaser has also required that lenders to the Debtors holding superpriority administrative expense rights and claims granted pursuant to Code section 364 must consent in writing to the payment of the Break-Up Fee and Expense Reimbursement from the proceeds of the sale of the Acquired Inventory to any other party irrespective of the lenders' own rights to such proceeds.

Acquired Inventory, as well as the Debtors' desire to promptly vacate and close their warehouses in order to minimize administrative expenses.

14.    In late November 2015, the Debtors and their representatives reached out to approximately five (5) parties (including firms specializing in liquidation sales). This list of prospective bidders was prepared based on (i) the Debtors' desire and need for a sophisticated, experienced buyer that could expeditiously and effectively close a transaction of this size and (ii) the Debtors' prepetition experience trying to negotiate potential transactions including the Acquired Inventory. During November and early December, certain potential buyers toured the Debtors' warehouses to inspect the Debtors' inventory. The Debtors subsequently received three expressions of interest by about mid-December 2015, and of those three, the Debtors determined the Stalking Horse's offer to represent the highest or otherwise best offer for the Acquired Inventory. The other expressions of interest offered less net cash value or were subject to other uncertainties, risks or conditions (including, for example, lower guaranteed cash amounts). Additionally, the Agreement with the Stalking Horse offers the Debtors the flexibility to exclude from the Sale the inventory at the Shreveport Facility (see Section 1.1(b)) in the event that a beneficial sale of the Shreveport Facility as a turnkey operation (which would include the inventory there) can be negotiated with another party. Further, in addition to the foregoing postpetition efforts, other smaller firms and parties from time to time communicated with the Debtors and their representatives about a potential acquisition of some or all of the Acquired Inventory; however, such communications were not productive in that such parties and the Debtors and their representatives agreed that any sale transaction with such parties would not be

viable given the size and other circumstances of this transaction.  Thus, overall, the Debtors and

their representatives engaged in substantial efforts to obtain the best offer for the Acquired

Inventory, culminating in the Debtors' negotiation of and entry into the Agreement with the

Stalking Horse.

### Continued Sale Process

15.     While the previous marketing and sale process was thorough, as discussed

above, the Debtors will send notice of the Sale Motion and Bidding Procedures to all parties that

the Debtors believe may be potentially interested in acquiring the Acquired Inventory promptly

after the Court's consideration of this Bidding Procedures Motion.  The Debtors and their

advisors will continue to respond to inquiries from prospective buyers through the bid deadline

approved by the Court for alternative bidders to bid on the Acquired Inventory.

16.     In light of the previous marketing efforts, the Debtors believe that the sale

process provides sufficient time to fully expose the Acquired Inventory for sale in the hope of

achieving a competitive bidding process.  The Debtors believe that the consummation of the Sale

to the Purchaser, or other successful bidder, will provide their creditors and other stakeholders

with the best opportunity possible for maximizing the value of the Acquired Inventory.  Except

as otherwise provided in definitive documentation with respect to the Sale, all of the Debtors'

rights, title and interest in and to the Acquired Inventory assets shall be sold free and clear of all

pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon.

### Relief Requested

17.     Pursuant to this Bidding Procedures Motion, the Debtors request that the

Court, among other things:

(a)     approve the Bidding Procedures attached as Annex 1 to the proposed

Bidding Procedures Order;

(b)     approve the requested break-up fee in the amount of $50,000 (the "Break-

Up Fee") (which is less than 3% of the Base Purchase Price), plus an

expense reimbursement not to exceed $20,000 (the "Expense

Reimbursement"), which amounts will have superpriority administrative

claim status in the Debtors' cases pursuant to sections 503(b) and 507 of

the Bankruptcy Code (with priority over any all claims against the

Debtors' estates except for any superpriority administrative expenses

granted to lenders to the Debtors pursuant to section 364), and shall and

payable solely from the proceeds of an alternative transaction[4];

(c)     approve the form and sufficiency of the Auction and Hearing Notice

attached as Annex 2 to the proposed Bidding Procedures Order;

(d)     approve the form and sufficiency of the Creditor Notice attached as Annex

3 to the proposed Bidding Procedures Order.

A proposed form of Bidding Procedures Order is attached hereto as **Exhibit A.**

---

[4] The Purchaser has required that the lenders to the Debtors holding superpriority administrative expense rights and claims granted pursuant to Code section 364 must consent in writing to the payment of the Break-Up Fee and Expense Reimbursement from the proceeds of the sale of the Acquired Inventory to any other party irrespective of the lenders' own rights to such proceeds (Agreement, § 11.4.8).

## **Proposed Bidding Procedures**

18.     The proposed Bidding Procedures are attached to the proposed order as

Annex 1.  The Bidding Procedures are summarized as follows:[5]

(a)     Qualified Bid. To participate in the bidding process and to have a
bid considered by Debtors, each Potential Bidder must deliver a
written offer or offers satisfying the below criteria.  A "Qualified
Bidder" is a Potential Bidder that delivers a binding bid that in
Debtors' sole discretion (after consultation with the Committee,
Comerica Bank and Bank of America, N.A. (the "Consultation
Parties")) satisfies the following criteria (a "Qualified Bid") and
that the Debtors determine in their sole discretion (after
consultation with the Consultation Parties) is reasonably likely to
make a bona fide offer upon consideration of any information
provided by the Potential Bidder demonstrating, in the Debtors'
discretion, the capability to consummate a sale transaction, should
the bidder be a Successful Bidder.

(b)     Bid Deadline. Each bid package must be delivered in written and
electronic form (where available) to: (a) Debtors' counsel,
Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th
Floor, Wilmington, Delaware 19899 (Attn: Michael R. Seidl,
mseidl@pszjlaw.com) and 10100 Santa Monica Blvd., 13th Floor,
Los Angeles, CA 90067 (Attn: Jeffrey N. Pomerantz,
jpomerantz@pszjlaw.com), (b) counsel to the Committee,
Lowenstein Sandler LLP, 65 Livingston Ave, Roseland, NJ 07068
(Attn:  Sharon L. Levine, slevine@lowenstein.com, Kenneth A.
Rosen, krosen@lowenstein.com, and Eric S. Chafetz,
echafetz@lowenstein.com), (c) counsel to Comerica Bank, Jackson
Walker L.L.P., 901 Main Street, Suite 6000, Dallas, TX 75202
(Attn:  David Stolle, dstolle@jw.com  and Bruce Ruzinsky,
bruzinsky@jw.com), and (d) counsel to Bank of America, N.A.,
Bryan Cave LLP, Two North Central Ave., Suite 2200, Phoenix,
AZ 85004 (Attn: Robert J. Miller, rjmiller@bryancave.com and
Brian Walsh, byan.walsh@bryancave.com), so as to actually be
received no later than February 5 , 2016, at 4:00 p.m. (prevailing
Eastern Time) (the "Bid Deadline"); provided, however, the
Debtors in their discretion (after consultation with the Consultation
Parties) may extend the Bid Deadline as to any particular
submitted bid.

---

[5]  To the extent that there are any inconsistencies between the summary description of the Bidding Procedures
contained herein and the Bidding Procedures, the terms of the Bidding Procedures control.

(c)     Bid Package. Each bid must include (collectively, the "Bid Package"): (i) a written and signed irrevocable and binding offer letter stating that (w) the bidder offers to consummate a transaction on terms and conditions no less favorable than those found in the Agreement and in an amount at least equal to the Minimum Bid (as defined below), (x) confirming that the bid will remain irrevocable and binding until five (5) business days following the entry of the Sale Order, (y) that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representations except as expressly set forth in the Modified Agreement (defined below), and (z) the Bidder shall, if designated as such in accordance with these procedures, serve as the Backup Bidder (defined below) until the consummation of the transaction pursuant to the Successful Bid; (ii) an executed copy of the Agreement as modified by the Potential Bidder in accordance with its bid ("Modified Agreement"); and (iii) an electronic markup of the Agreement showing the revisions in the Modified Agreement, along with a clean copy of the Modified Agreement (formatted as a Microsoft Word document). Debtors, in consultation with the Consultation Parties, shall determine whether any Modified Agreement that modifies the Agreement in any respect beyond the identity of the purchaser and the purchase price under the Agreement is a Qualified Bid. Further, the Debtors reserve the right to consider bids for less or more assets than all the Acquired Inventory and to modify these procedures accordingly; provided further, the Debtors will evaluate bids, in their discretion, subject to consultation with the Consultation Parties, to determine whether such bid or combination of bids maximizes the value of the Debtors' estates as a whole.

(d)     Minimum Bid. The amount of the purchase price in any bids for the Acquired Inventory must provide for value that is at least (i) $150,000 in the aggregate, more than the purchase price contained in the Agreement plus (ii) $70,000, representing the sum of the Break-Up Fee and Expense Reimbursement of $50,000 and $20,000, respectively (the "Minimum Bid").

(e)     Financial Information. The Bid Package must contain such financial and other information that will allow Debtors, in consultation with the Consultation Parties, to make a determination as to the bidder's financial wherewithal and its ability to consummate the transactions contemplated by the Modified Agreement, including evidence of adequate financing and any proposed conditions to closing.

11

(f)    <u>Additional Bid Protections</u>.  The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment, or propose to modify any of the Bidding Procedures.

(g)    <u>Identity of Bidders</u>.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, including the names and addresses of any members or individuals with an interest in the entity, and the complete terms of any such participation, as well as disclose the organization form and the business conducted by each entity.  Any Potential Bidder shall be required to provide such additional information as the Debtors may require, subject to input from the Consultation Parties, regarding a Potential Bidder's ability to satisfy the requirements of the applicable regulatory authorities.

(h)    <u>Due Diligence</u>.  The bid must not contain any due diligence or financing contingencies of any kind, and must affirmatively acknowledge that the bidder (i) had an opportunity to conduct due diligence prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Inventory in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Inventory, or the completeness of any information provided in connection therewith.

(i)    <u>Consents</u>.  Each Potential Bidder must represent that it obtained all necessary organizational approvals to make its competing bid and to enter into and perform the Modified Agreement and include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

(j)    <u>Deposit</u>.  A Potential Bidder for the Acquired Inventory (other than the Purchaser) must deposit 10% of the purchase price under the Modified Agreement (the "<u>Deposit</u>") with Debtors' counsel (the "<u>Deposit Agent</u>") in the form of a certified check or wire transfer by the Bid Deadline.  The Potential Bidder shall forfeit the Deposit if (i) the Potential Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein, (ii) the bidder is the Backup Bidder and withdraws the bid prior to the consummation of the Sale contemplated by the Successful Bid,

12

or (iii) the bidder is the Successful Bidder and (x) withdraws the bid before the consummation of the sale contemplated by the Successful Bid, or (y) breaches the Agreement (or Modified Agreement, as applicable) associated with such bid. The Deposit shall be returned to the Potential Bidder (unless such Potential Bidder has forfeited its Deposit) (i) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder; (ii) if the Potential Bidder is determined to not be the Successful Bidder or the Backup Bidder at the Auction, no later than five (5) business days following conclusion of the Auction; or (iii) if the Potential Bidder is determined to be the Backup Bidder, no later than five (5) business days after consummation of the Sale to the Successful Bidder. The Deposit will not be required to be maintained in an interest bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

19.     The Debtors shall have the right, after consultation with the Consultation Parties, to determine whether a bid is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids, as soon as possible, and prior to the Auction. For the avoidance of doubt, the Purchaser is a Qualified Bidder and the Agreement constitutes a Qualified Bid. After Debtors determine which bids are Qualified Bids, Debtors shall distribute the Qualified Bids, including the associated Modified Agreements, to the Purchaser.

20.     In the event that Debtors timely receive at least one Qualified Bid (other than the Purchaser's Agreement), the Debtors shall conduct the Auction with respect to the Acquired Inventory. The Auction will take place at the Delaware offices of Pachulski Stang Ziehl & Jones, LLP located at 919 North Market Street, 17th Floor, Wilmington, DE 19801, starting at 10:00 a.m. (prevailing Eastern Time), or at such other place, date and time as may be designated by Debtors, in consultation with the Consultation Parties, at or prior to the Auction. The Auction shall be governed by the following procedures:

13

(a)     <u>Participation</u>.  Qualified Bidders shall be entitled to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction or through a duly authorized representative; provided, however, the Debtors may determine in their discretion (after consultation with the Consultation Parties) to permit bidders to attend the Auction telephonically or by video conference.  Creditors of the Debtors shall be entitled to attend the Auction.  At least one day prior to the commencement of the Auction, each Qualified Bidder must confirm in writing that it will participate in this Auction; provided, however, that in the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.  Representatives of, and counsel for, the Consultation Parties shall be permitted to attend the Auction, and any other party in interest, including members of the Committee.

(b)     <u>Anti-Collusion</u>.  At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with any other Qualified Bidder with respect to the bidding or the Sale.

(c)     <u>Conduct of Auction</u>.  The Auction will be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid.

(d)     <u>Bidding</u>.  Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders for all of the Acquired Inventory may then submit successive bids in increments of $100,000 (the "<u>Bid Increment</u>").  Successive bids in subsequent bidding rounds may be determined in a different Bid Increment by amounts as determined by the Debtors, in consultation with the Consultation Parties.  Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

(e)     <u>Successful Bid</u>.  If an Auction is conducted, it shall continue until Debtors determine in their sole discretion, after consultation with the Consultation Parties, which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (such bid or bids, as applicable, the "<u>Successful Bid</u>"); *provided, however*, in the event the Purchaser's last bid is higher or otherwise better than any bid submitted by a Qualified Bidder (as determined by the Debtors in their sole discretion, after consultation with the Consultation Parties), the Purchaser's last bid as per the Purchaser's Agreement (as existing or modified at the Auction) shall be deemed to be the Successful Bid.  The Qualified Bidder submitting such Successful Bid shall become the "<u>Successful Bidder</u>," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Agreement, as

14

applicable, together with any changes made thereto by the Successful Bidder at the Auction. Within one day after the conclusion of the Auction, but in any event prior to the commencement of the Sale Hearing (as defined below), the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Notwithstanding any of the foregoing, the Debtors reserve the right (after consultation with the Consultation Parties) to accept a combination of bids for the Debtors' assets and/or to consider the value of assets excluded from any bid, for the purpose of determining the highest or otherwise best bid(s).

(f)     Backup Bid. At the conclusion of the Auction, Debtors will also determine in their sole discretion (after consultation with the Consultation Parties) and announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "Backup Bid"). The Qualified Bidder submitting such Backup Bid shall become the "Backup Bidder," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Agreement, together with any changes made thereto by the Backup Bidder at the Auction. *The Backup Bid shall remain open and irrevocable until the consummation of the Sale of the Acquired Inventory pursuant to the Successful Bid, provided that such Backup Bid shall only remain open until the Outside Date (as defined below).* In the event the Backup Bidder fails to comply with the requirements of this paragraph, it will be deemed to have forfeited its Deposit. The Backup Bidder's Deposit will be returned by the Debtors upon the earlier of the following: (i) the Outside Date, or (ii) immediately following consummation of the Successful Bid. For the avoidance of doubt, the Purchaser as a Qualified Bidder shall automatically be deemed a Backup Bidder, under the terms of its bid, if its bid is determined by the Debtors in their sole discretion, after consultation with the Consultation Parties, to be the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction; *provided, however,* notwithstanding any other provision contained herein, the Purchaser or any other bidder shall remain as Backup Bidder until February 29, 2015 (the "Outside Date").

(g)     Reservation of Rights. Notwithstanding any provision herein to the contrary, the Debtors in their discretion (after consultation with the Consultation Parties) may adopt rules for the Auction at or prior to the Auction that, in their discretion, will better promote the goals of the Auction.

21.     Notwithstanding any of the foregoing, the Bidding Procedures will

provide that the Debtors reserve the right (after consultation with the Consultation Parties) to

DOCS_DE:204239.1

waive any of the Bidding Procedures, to the extent such waiver is in the best interest of the Debtors' estates.

### Auction and Hearing Notice

22.     On a date no later than two business days following entry of the Bidding Procedures Order, Debtors shall mail the notice of the proposed sale of the Acquired Inventory (the "Auction and Hearing Notice") in the form approved in the Bidding Procedures Order by first class mail, postage prepaid, to (a) any party requesting service in this case, (b) all potential purchasers identified by the Debtors or their agents, and (c) any other party known to the Debtors to have or assert an interest in any of the Acquired Inventory.

### Notice of Sale Hearing

23.     As noted above, Debtors propose that the Auction occur on **February 9, 2016**, and that the Sale Hearing occur no later than **February 10, 2016**. The Debtors propose that objections, if any, to the Sale Motion be filed on or before 4:00 p.m. on **February 3, 2016** (prevailing Eastern Time).

24.     The Debtors request that the Court approve the manner of notice of the Sale Motion, the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the forms attached to the Bidding Procedures Order (the "Sale and Bid Procedures Notices"), which the Debtors will serve on the following parties:

(a)     the U.S. Trustee;

(b)     counsel to the Committee;

(c)     all parties known by the Debtors to assert a lien on any of the Acquired Inventory;

(d)   all entities who either executed nondisclosure agreements with the Debtors in connection with a potential acquisition of any or all of the Acquired Inventory or whom the Debtors believe may have an interest in bidding;

(e)   the Purchaser and its counsel; and

(f)   all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure as of the date of entry of the Bidding Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

25.   Additionally, the Debtors propose to serve the Creditor Notice on all known creditors of ODC and MLC.

26.   The Debtors propose to serve the Sale and Bid Procedures Notices and the Creditor Notice within two (2) business days from the date of entry of the Bidding Procedures Order, by first-class mail, postage prepaid, on the appropriate parties. Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Debtors' counsel.

**Sale Hearing**

27.   The Successful Bid and the Backup Bid (or the Purchaser's Agreement in the event the Auction is not held) will be subject to approval by the Court at the Sale Hearing free and clear of all liens, claims, interest, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the liens and interests permitted under the Agreement) with all such liens, claims, interests, and encumbrances to attach to the proceeds of the Sale of the Acquired Inventory, except as otherwise provided with the same validity and in the same order of priority as they attached to the Acquired Inventory prior to the Sale. Upon approval of the Backup Bid

17

by the Court, the Backup Bid shall (subject to its terms) remain open and irrevocable until the earlier of (i) consummation of the Sale pursuant to the Successful Bid or (ii) the Outside Date.

28.    The Debtors request that the Court schedule the Sale Hearing on **February 10, 2016**. Further, the Debtors request that objections, if any, to the Sale Motion be filed no later than 4:00 p.m. prevailing Eastern Time on **February 3, 2016**.

<u>Closing</u>

29.    The closing shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Court at the Sale Hearing.

<u>Approval of the Bidding Procedures and Bid Protections is Appropriate and In the Best Interest of the Estate</u>

30.    As indicated above, the Debtors request that the Court approve the Bidding Procedures, the Break-Up Fee and Expense Reimbursement in their entirety, as is customary in similar circumstances.

31.    The proposed Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding. The Bidding Procedures were negotiated in good faith and at arms' length, and represent the best method for maximizing the return to the estates for the Acquired Inventory. Indeed, the Bidding Procedures are substantively similar to the bid procedures previously approved by the Court in respect to the sale of NCOC's assets [Docket No. 160].

32.    To compensate the Purchaser whose bid will be subject to higher or better offers, the Debtors seek approval of the Break-up Fee and Expense Reimbursement in

18

accordance with the terms of the Agreement. The Debtors and Purchaser believe that the amount of the Break-up Fee and Expense Reimbursement is reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Purchaser, and the risk to the Purchaser that a third-party offer may ultimately be accepted, and that approval of the Break-up Fee and Expense Reimbursement under the terms of the Agreement (including the superpriority administrative claim status thereof) are necessary to preserve and enhance the value of the Debtors' estates. The Debtors believe that the agreement to pay the Break-Up Fee and Expense Reimbursement in accordance with the terms of the Agreement is necessary to induce the Purchaser to enter into the transactions encompassed by the Agreement and thus to enable the Debtors to obtain the highest and best possible price for the Acquired Inventory. Further, the Debtors believe that the Break-up Fee and Expense Reimbursement are fair and reasonable provision under all the circumstances.

33.     The Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values. The Break-up Fee and Expense Reimbursement will encourage competitive bidding and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

34.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of

the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

35.      The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estate. *See id.* at 533.

36.      The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value a debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely,

"the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

37.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-up Fee and Expense Reimbursement pass muster. The Agreement and the Debtors' agreement to pay the Break-Up Fee and Expense Reimbursement pursuant to the terms thereunder is the product of good faith, arm's-length negotiations between the Debtors and the Purchaser. The Break-up Fee and Expense Reimbursement are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Purchaser of being used as a stalking horse bidder. Similarly, the Agreement provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Property will be] sold will reflect [its] true worth." *Id.* The Break-up Fee and Expense Reimbursement will permit the Debtors to insist that competing bids for the Acquired Inventory, made in accordance with the Bidding Procedures, be materially higher or otherwise better than the Agreement (or competing agreement), which is a clear benefit to the Debtors' estates.

38.     Finally, the Break-Up Fee, in the amount of $50,000, which is less than 3% of the Base Purchase Price under the Agreement, is within the spectrum of break-up and similar fees approved by bankruptcy courts in chapter 11 cases. Further, the Break-Up Fee with the Expense Reimbursement (of no more than $20,000) together equal approximately 3.9% of the Base Purchase Price – which is also within the range of termination fees routinely approved in this District. *See, e.g., In re Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del.,

21

Feb. 11, 2015) (Court approved break-up fee, which together with expense reimbursement, was 4.3% of the purchase price under stalking horse agreement); *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del., Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (Court approved break-up fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); *In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del., Feb. 14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del., July 14, 2006) (Court approved 3.3% break-up fee); *In re AmeriServe*, Case No. 00-0358 (PJW) (Bankr. D. Del., Sept. 27, 2000) (Court approved 3.64% break-up fee); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del., Apr. 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of

22

7.47%); *In re Edison Bros. Stores. Inc., et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of over 3.5%).

### No Prior Request

39.    No prior request for the relief sought in this Bidding Procedures Motion has been made to this or any other court.

### Notice

40.    Notice of this Motion and a copy of this Motion will be provided to (a) the Office of the United States Trustee; (b) counsel to the Committee; (c) all parties who are known by the Debtors to assert liens with respect to the Acquired Inventory; (d) all entities who executed NDAs with the Debtors in connection with a potential acquisition of any or all of the Acquired Inventory or whom the Debtors believe may have an interest in bidding; (e) the Purchaser and its counsel; and (f) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.  Upon approval of this Motion, the Debtors will serve notice of the Sale Hearing, Bidding Procedures and related matters on all of the foregoing service parties and all other known creditors of ODC and MLC (as proposed herein, subject to Court approval).  The Debtors respectfully submit that such notice is sufficient, and requests that the Court find that no further notice of the relief requested herein is required.

DOCS_DE:204239.1

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: December 30, 2015          PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No.143717)
Maxim B. Litvak (CA Bar No. 215852)
Michael R. Seidl (DE Bar No. 3889)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: 302/652-4100
Facsimile: 302/652-4400
E-mail:    jpomerantz@pszjlaw.com
           mlitvak@pszjlaw.com
           mseidl@pszjlaw.com

Counsel for the Debtors and Debtors in Possession

DOCS_DE:204239.1